661 F.Supp. 1013 (1987)
TOWERS HOTEL CORPORATION, Plaintiff,
v.
Gerald A. RIMMEL, Receiver, Defendant.
No. 80-1563C(1).
United States District Court, E.D. Missouri.
June 2, 1987.
Robert Hoemeke, Richard A. Wunderlich, St. Louis, Mo., for plaintiff.
Richard S. Bender, David V. Capes, Gene M. Zafft, Merle L. Silverstein, St. Louis, Mo., Ben Cotten, G. Lindsay Simmons, William J. Slosberg, Washington, D.C., Lloyd A. Palans, Clayton, Mo., John Michael Clear, Michael E. Kohn, St. Louis, Mo., Gerald A. Rimmel, Clayton, Mo., Donald F. Flint, Chief Counsel, Dept. of HUD, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This matter is now before the Court on plaintiff Towers Hotel Corporation's motion to enforce the Second Restated Settlement Agreement between plaintiff and defendant Gerald A. Rimmel, Receiver. The Court held a hearing on Towers' motion on January 20, 1987. Both Towers and the Receiver submitted documentary evidence and presented oral argument in support of their respective positions. Subsequently, *1014 on March 13, 1987, the Court ordered the parties to file with the Court certain additional information. The parties filed separate responses.
Towers contends that it has complied with its obligation under the Second Restated Settlement Agreement. Thus, Towers contends that it is presently entitled (1) to $500,000 in escrow funds from the Receiver, and (2) to an exchange of releases. Upon consideration of the parties' memoranda, documentary evidence, argument, post-hearing letters, and responses to the Court's March 13, 1987, order, the Court finds that, as explained below, Towers has not complied with its obligation under paragraph 2(D) of the Second Restated Settlement Agreement. Accordingly, Towers' motion to enforce the Second Restated Settlement Agreement is denied.

Background
The Mansion House Center (Mansion House) consists of three 28-story towers in downtown St. Louis, Missouri. The three towers are known as the North, Center, and South Towers. Mansion House was constructed with the proceeds of three mortgage loans made in 1964 by certain private lenders to Owner-Partnerships. The United States Department of Housing and Urban Development (HUD) insured these loans. Owner-Partnerships entered into and agreed to be subject to a HUD Regulatory Agreement.
In 1972, after construction of Mansion House was completed, Owner-Partnerships defaulted on the mortgages. HUD, as insurer, paid the claims of the private lenders and became the holder of the notes and deeds of trust. In 1976, after learning that Owner-Partnerships had diverted Mansion House funds for improper purposes and that Owner-Partnerships had mismanaged Mansion House, the United States (on behalf of HUD) filed suit for recovery of the improperly expended funds. Subsequently, the United States filed a Motion for Appointment of a Receiver pendente lite to manage, preserve, and protect the Mansion House properties. On September 8, 1976, this Court appointed defendant herein, Gerald A. Rimmel, as Receiver of Mansion House.
On November 16, 1978, the Receiver (acting as the landlord of Mansion House) and Towers entered into a twenty-year renewable lease of the South Tower. (Lease, § 2.1 & Art. 22). The Lease explicitly provided that the terms, covenants, agreements, and conditions of the Lease were subject to the HUD Regulatory Agreement entered into by Owner-Partnerships. (Lease, § 1.1(a)(2)). In 1980, Towers filed the instant suit against the Receiver alleging that the Receiver had breached the Lease. The Receiver counterclaimed against Towers alleging wrongful conduct. On January 19, 1984, the Receiver and Towers entered into the Second Restated Settlement Agreement (SRSA) in order to settle the instant suit. On March 15, 1984, this Court approved the SRSA with certain conditions. United States v. Mansion House Center, No. 80-1563C(1) (E.D.Mo. Mar. 15, 1984) [Available on WESTLAW, DCT database]. The Eighth Circuit approved the SRSA, but rejected the conditions imposed by this Court. United States v. Altman, 750 F.2d 684, 697-698 (8th Cir.1984). On December 2, 1985, this Court unconditionally approved the SRSA. Towers Hotel Corporation v. Rimmel, No. 80-1563C(1) (E.D.Mo. Dec. 2, 1985) [Available on WESTLAW, DCT database].

The Settlement Agreement
Under the SRSA as approved, Towers is required to construct a banquet facility. (SRSA, ¶ 2(A)). However, if the lowest acceptable bid for a banquet facility exceeds $1,700,000 or if Towers cannot obtain an acceptable loan commitment for the construction of a banquet facility, then Towers has the right not to construct a banquet facility and instead to construct certain other specified alternate capital improvements. (SRSA, ¶ 2(D)). Whether Towers constructs a banquet facility or an alternate capital improvement, the Receiver is required to "bear and pay as and for Receiver's costs" of construction the sum of $500,000. (SRSA, ¶ 2(C)). To secure the Receiver's obligation in this respect, the Receiver is required to escrow $500,000 in cash or certificates of deposit. (SRSA, ¶ 2(C)).
*1015 On February 18, 1986, Towers obtained approval from the Receiver to construct a sprinkler system in the South Tower. During the spring and summer of 1986, Towers constructed a sprinkler system in the South Tower.
In September, 1986, Towers determined that the lowest acceptable bid for construction of a banquet facility far exceeds $1,700,000. Accordingly, on Friday, September 26, 1986, Towers orally notified the Receiver of its decision not to construct a banquet facility. (Plaintiff's Exhibit 19; Defendant's Exhibit 4). On October 1, 1986, Towers by letter confirmed its decision not to construct a banquet facility. (Plaintiff's Exhibit 19). On October 21, 1986, Towers informed the Court of its decision not to construct a banquet facility. (Report of Towers Hotel Corporation on the Status of the Parties' Settlement Agreement).
Thereafter, on December 5, 1986, Towers filed the instant motion to enforce the SRSA. Towers contends: (1) that Towers properly decided not to construct a banquet facility; (2) that Towers properly decided to construct an alternate capital improvement; (3) that Towers is not required to obtain prior written approval, from either HUD or the Receiver, to treat a specific capital improvement as the alternate capital improvement to be constructed pursuant to paragraph 2(D) of the SRSA; (4) that paragraph 2(D) of the SRSA requires that Towers expend only $500,000 on an alternate capital improvement; (5) that, pursuant to its decision, Towers constructed a sprinkler system in the South Tower; (6) that Towers expended in excess of $500,000 on the sprinkler system; (7) that Towers obtained prior written approval from HUD and the Receiver to construct the sprinkler system, as required by paragraph 2(D) of the SRSA; and (8) that the sprinkler system is a qualifying capital improvement under paragraph 2(D)(iii) of the SRSA. Thus, Towers concludes that it has complied with its obligation under paragraph 2(D) of the SRSA, and that the Receiver is now required to release the $500,000 in escrow funds to Towers.
As explained below, the Court concludes that Towers is required to obtain prior written approval, from both HUD and the Receiver, to treat a specific capital improvement as the alternate capital improvement to be constructed pursuant to paragraph 2(D) of the SRSA. Towers did not obtain such prior written approval. Further, and more importantly, the Court concludes that the sprinkler system does not qualify as an alternate capital improvement under paragraph 2(D) of the SRSA because: (1) Towers is required to expend $1,700,000 on an alternate capital improvement, and (2) Towers was required to construct the sprinkler system under the Lease.

1. Prior Written Approval From HUD and the Receiver Under Paragraph 2(D).
If the lowest acceptable bid for a banquet facility exceeds $1,700,000 or if Towers cannot obtain an acceptable loan commitment for the construction of a banquet facility, then Towers has the right not to construct a banquet facility. In this circumstance, paragraph 2(D) of the SRSA provides that:
Towers will have the right to draw upon the Escrow Funds, to be applied at its election, subject to the approval of the United States Department of Housing and Urban Development ("HUD"), in accordance with the requirements of the HUD Regulatory Agreement as defined in Section 1.2(u) of the South Tower Lease, dated November 16, 1978, as amended (the "Lease") and approved in accordance with the terms of the Lease, for the following: (i) energy conversion and/or improvement to the boiler-equipment room servicing the South Tower complex including the south commercial premises; (ii) installation of outside elevators; or (iii) any other capital additions or structural improvements to the South Tower which will enhance the value and economic viability of the South Tower.
Second Restated Settlement Agreement, ¶ 2(D) (emphasis added).
constructing a given capital improvement. On February 18, 1986, Towers obtained prior written approval from the Receiver to construct the sprinkler system. (Plaintiff's Exhibit 22, ¶ 1). That approval incorporates by reference the prior written approval from HUD to construct the sprinkler system. (Plaintiff's Exhibit 22, ¶ 3). Thus, Towers concludes that it obtained whatever prior written approval paragraph 2(D) requires. The Court disagrees.
The Lease is explicitly subject to the HUD Regulatory Agreement. (Lease, § 1.1(a)(2)). The HUD Regulatory Agreement provides that:
6. Owners shall not without the prior written approval of the Commissioner: (d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.
HUD Regulatory Agreement, § 6(d). Likewise, the Lease provides that neither the Receiver nor Towers will remodel, add to, reconstruct, or demolish any part of the South Tower without prior written approval from HUD. (Lease, § 5.3 & § 6.7). Thus, the Lease directly required that Towers obtain prior written approval from HUD before constructing the sprinkler system.
The Lease further provides that Towers can alter, add to, renovate, or restore the South Tower only with the Receiver's consent, which consent is not to be unreasonably withheld. (Lease, § 6.1 & see § 34.8). However, if any such project involves an estimated cost in excess of $50,000, then Towers must obtain prior written approval from the Receiver, which approval the Receiver shall not reasonably withhold. (Lease, § 6.2(b) & see § 34.8). As the estimated cost of the sprinkler system exceeded $50,000, the Lease directly required that Towers obtain prior written approval from the Receiver before constructing the sprinkler system.
Under the Lease, Towers was directly required to obtain prior written approval from the Receiver and from HUD before constructing the sprinkler system. If, as Towers argues, paragraph 2(D) only requires that Towers obtain prior written approval from HUD and the Receiver before constructing the sprinkler system, then paragraph 2(D)'s approval provision does not require any approval more than that which Towers is already directly required to obtain under the Lease. In effect, Towers' reading of paragraph 2(D) renders paragraph 2(D)'s approval requirement total surplusage. The Court concludes that the parties did not intend paragraph 2(D)'s approval requirement to be surplusage. Thus, the Court concludes that paragraph 2(D) requires some type of approval by HUD and by the Receiver other than approval before construction of a project. Paragraph 2(D) requires some type of approval in relation to Towers' notification to HUD and the Receiver of its decision not to construct a banquet facility and instead to construct an alternate capital improvement.
A conceivable reading of the approval provision is that it requires that, after Towers notifies HUD and the Receiver of its decision not to construct a banquet facility, Towers must obtain approval from HUD and the Receiver to construct its chosen alternate capital improvement. So construed, the approval provision would merely set the time when Towers is obligated to obtain the HUD and Receiver approval required under the Lease and under the Regulatory Agreement.
The Court rejects this reading of the approval provision. As drafted, the approval language requires approval of the action in the phrase immediately preceding the approval language, namely approval of the right to draw upon and/or of the election as to application of the Escrow Funds. Interpreting the approval provision only to set the time for the Lease required approval of construction of a project would totally fail to read the approval language in the context of the remainder of paragraph 2(D), and specifically in the context of the phrase immediately preceding the approval *1017 language. Further, Towers has not advanced this reading of the approval provision and has consistently disavowed the existence of any requirement that it obtain HUD and Receiver approval after it notified them of its decision not to construct a banquet facility. Moreover, Towers did not obtain approval after it notified HUD and the Receiver of its decision not to construct a banquet facility. Thus, Towers would not have complied with the procedural requirement of this reading of the approval provision.
The approval provision of paragraph 2(D) provides: "Towers will have the right to draw upon the Escrow Funds, to be applied at its election, subject to the approval of [HUD] ... and approved in accordance with the ... Lease...." As the Court reads this approval provision, as noted above, the approval language requires approval of the action in the phrase immediately preceding the approval language. Thus, as drafted, HUD and Receiver approval could be either (1) for Towers' right to draw upon or use the Escrow Funds for an alternate capital improvement,[1] or (2) for Towers' election as to application of the Escrow Funds.
If the lowest acceptable bid for a banquet facility exceeds $1,700,000, then Towers has an absolute right not to construct a banquet facility and, instead, to construct an alternate capital improvement using the Escrow Funds. Thus, the Court concludes that the approval provision of paragraph 2(D) cannot give HUD and the Receiver a right of approval as to Towers' right to draw upon or use the Escrow Funds in the event that the cost of a banquet facility exceeds $1,700,000. Therefore, the Court concludes that the approval provision of paragraph 2(D) gives HUD and the Receiver an approval right as to Towers' election as to application of the Escrow Funds.
HUD and the Receiver's right of approval as to Towers' application of the Escrow Funds for a capital improvement must be a right of approval with respect to whether a proposed capital improvement qualifies as and may be treated as the alternate capital improvement to be constructed pursuant to paragraph 2(D). Paragraph 2(D) recognizes that the Receiver, as landlord, has a long-term interest in the economic viability of the South Tower. Paragraph 2(D) protects that interest by ensuring that the Receiver has a say in the decision as to what project gets built pursuant to paragraph 2(D). As the Receiver pointed out at the hearing, a bowling alley might "enhance the value and economic viability of the South Tower." Yet, clearly, paragraph 2(D) contemplates that the Receiver could reject Towers' proposal to build a bowling alley to satisfy its obligation under paragraph 2(D). Thus, the Receiver has a right of approval as to whether a proposed capital improvement qualifies as and may be treated as the alternate capital improvement to be constructed pursuant to paragraph 2(D). This right of approval is narrow when Towers chooses to construct a project which it contends is a capital improvement specified in paragraph 2(D)(i) and (ii), but is broader when Towers chooses to construct a project which it contends is a capital improvement which "enhances the value and economic viability of the South Tower" within the meaning of paragraph 2(D)(iii).
Paragraph 2(D) requires HUD approval in accordance with the Regulatory Agreement and approval in accordance with the Lease. HUD approval in accordance with the Regulatory Agreement is prior written approval. (HUD Regulatory Agreement, § 6(d)). Approval in accordance with the Lease is also prior written approval from HUD. (Lease, § 5.3 & § 6.7). As the estimated cost of a sprinkler project exceeds $50,000, approval in accordance with the Lease is also prior written approval from the Receiver. (Lease, § 6.2(b)). Thus, paragraph 2(D) requires that Towers obtain prior written approval from HUD and from the Receiver as to its election as to *1018 application of the Escrow Funds, that is, prior written approval to treat a specific capital improvement as the capital improvement to be constructed pursuant to paragraph 2(D). (See also Plaintiff's Exhibits 3 & 6). Towers is required to obtain this prior written approval for its election as to application of the Escrow Funds after Towers notifies HUD and the Receiver that it will not construct a banquet facility and will instead construct some other capital improvement. In addition to this paragraph 2(D) approval, Towers must still obtain approval of any construction plans pursuant to the Lease requirements.
Towers did not obtain prior written approval from HUD and the Receiver for Towers' election as to application of the Escrow Funds. Towers did not obtain prior written approval from HUD and the Receiver to treat the sprinkler system as the alternate capital improvement to be constructed pursuant to paragraph 2(D)(iii) of the SRSA. Towers is not entitled unilaterally to declare the sprinkler system to be the paragraph 2(D)(iii) qualifying alternate capital improvement. Towers did not comply with the procedural requirement of paragraph 2(D). Thus, Towers did not fulfill its obligations under paragraph 2(D).

2. Qualification of the Sprinkler System as an Alternate Capital Improvement Under Paragraph 2(D).
Despite the Court's conclusion above that Towers did not comply with the procedural approval requirement of paragraph 2(D), the Court must inquire whether the sprinkler system would have qualified under paragraph 2(D) had Towers timely applied for HUD and Receiver approval of the sprinkler system as an alternate capital improvement. If the sprinkler system would have qualified under paragraph 2(D), the Court, as a court of equity, might credit Towers with its expenditures on the sprinkler system.

A. Qualification as to Cost.
Paragraph 2(D) provides that if the lowest acceptable bid for a banquet facility exceeds $1,700,000, then Towers can draw upon the $500,000 in Escrow Funds to construct certain alternate capital improvements. Paragraph 2(D) does not state how much Towers is required to expend on such an alternate capital improvement.
Towers contends that it is required to expend only $500,000 on such an alternate capital improvement. A January 11, 1984, letter from plaintiff's attorney to defendant's attorney (Plaintiff's Exhibit 5) and a statement by this Court in its March 15, 1984, memorandum, United States v. Mansion House, No. 80-1563C(1), slip op. at 13 (E.D.Mo. Mar. 15, 1984) ("The effect of new ¶ 2(D) is that Towers can elect to build the facility or to spend $500,000.00 on certain specified improvements."), both strongly support plaintiff's position. After lien-free completion of an alternate capital improvement and after certification of the cost, the Receiver is required to pay Towers the $500,000 in Escrow Funds. (SRSA, ¶¶ 2(C) and 2(G)). Thus, Towers concludes that its net expenditure on an alternate capital improvement is supposed to be $0. Towers expended over $500,000 to construct the sprinkler system.
The Receiver contends that Towers is required to expend $1,700,000 on an alternate capital improvement. The Receiver contends that, after reimbursement of the $500,000 in Escrow Funds, Towers' net expenditure on an alternate capital improvement is supposed to be $1,200,000.
Paragraphs 2(A) and 2(B) require that Towers construct a banquet facility. Just as paragraph 2(D) does not state how much Towers must expend on an alternate capital improvement, no provision of paragraphs 2(A) or 2(B), or any other part of the SRSA, states how much Towers must expend on a banquet facility. However, paragraph 2(D) provides that if the lowest acceptable bid for a banquet facility exceeds $1,700,000, then Towers does not have to build a banquet facility. On the basis of this "upset figure," the parties have consistently and uniformly agreed that Towers must expend $1,700,000 on a banquet facility. As with an alternate capital improvement, after lien-free completion of a banquet facility and after certification of the cost, the Receiver *1019 is required to pay Towers the $500,000 in Escrow Funds. (SRSA, ¶¶ 2(C) & 2(G)). Thus, Towers' net expenditure on a banquet facility is supposed to be $1,200,000.
As paragraph 2(D) does not state how much Towers must expend on an alternate capital improvement, in order to so determine, the Court will read paragraph 2(D) in the context of the remainder of paragraph 2 and the remainder of the SRSA.
The parties agree that an alternate capital improvement under paragraph 2(D) is to be a substitute for a banquet facility under paragraphs 2(A) and 2(B). The Court believes that, as a substitute for a banquet facility, the cost of an alternate capital improvement should be roughly the same as the cost of a banquet facility. The parties agree that Towers is required to make a gross expenditure of $1,700,000 on a banquet facility (or a net expenditure of $1,200,000). This indicates that Towers is required to make a gross expenditure of $1,700,000 on an alternate capital improvement (or a net expenditure of $1,200,000).
Part of the Receiver's consideration for settling his claims against Towers and for agreeing to infuse the $500,000 in Escrow Funds into the South Tower is Towers' agreement under paragraph 2 to make a net infusion of $1,200,000 into the South Tower in the form of a banquet facility, such net infusion to be in addition to Towers' obligation to expend in excess of $1,800,000 on other improvements under paragraph 7 of the SRSA. It is inconceivable that the Receiver intended to agree to give Towers the option of making a net infusion of $1,200,000 into a banquet facility or making a net infusion of $0 into an alternate capital improvement. In contrast, it is perfectly reasonable for Towers to intend to agree to make a net infusion of $1,200,000 either into a banquet facility or into an alternate capital improvement which would enhance the value and economic viability of the South Tower. When paragraph 2(D) is read in the context of paragraphs 2(A) and 2(B), the parties' reasonable expectations should be that Towers is required to make a net infusion of $1,200,000 into the South Tower pursuant to paragraph 2(D).
The remainder of paragraph 2 is replete with language which clearly indicates that the Receiver's $500,000 in Escrow Funds is intended to cover only part of the cost of whatever capital improvement Towers constructs in the South Tower pursuant to paragraph 2. Paragraph 2(C) refers to the "Receiver's contribution toward the costs to construct the facility" or an alternate capital improvement. Likewise, paragraph 2(G) refers to the Receiver's obligation "to contribute any amount towards the costs of the Facility" or an alternate capital improvement. This language, "contribut(ion) (...) toward(s)," clearly indicates that the Receiver's $500,000 in Escrow Funds will cover only part of the costs of either a banquet facility or an alternate capital improvement. Further, paragraph 2(C) states that the "Receiver shall bear and pay as and for Receiver's costs" of the banquet facility or of the paragraph 2(D) alternate capital improvements "the sum of $500,000 (the `Escrow Funds')," and paragraph 2(G) refers to the "total costs" of the construction of the banquet facility or an alternate capital improvement. This language clearly indicates that there will exist costs, other than the Receiver's costs, for both the banquet facility and for an alternate capital improvement.
The language in paragraphs 2(C) and 2(G) clearly indicates that there will exist costs, other than the Receiver's costs, for, and that the Receiver's $500,000 in Escrow Funds will cover only part of the cost of, whatever capital improvement Towers constructs in the South Tower pursuant to paragraph 2. Thus, paragraphs 2(C) and 2(G) clearly indicate that Towers is required to make some positive net expenditure and net infusion into the South Tower pursuant to paragraph 2(D).
Paragraph 7 of the SRSA requires that Towers expend at least $1,800,000 on improvements in addition to and other than the banquet facility or the alternate capital improvement provided for in paragraph 2(D). The Court concludes that paragraph 7 in no way informs the determination of *1020 how much Towers is required to expend on the alternate capital improvement which Towers constructs pursuant to paragraph 2(D). Likewise, the Court finds that there are no provisions in any part of the SRSA outside of paragraph 2 which inform the determination of how much Towers is required to expend on the alternate capital improvement which Towers constructs pursuant to paragraph 2(D).
The Court finds that the implication from plaintiff's Exhibit 5 is not supported by the text of paragraph 2(D) when paragraph 2(D) is read in the context of the remainder of paragraph 2. Further, to a certain extent, plaintiff's Exhibit 5 shows that Towers was aware of the failure of paragraph 2(D) to state how much Towers is required to expend on an alternate capital improvement. This makes the Court extremely reluctant to diverge from what the Court finds to be the much more reasonable interpretation of paragraph 2(D), namely that Towers is required to expend $1,700,000 on an alternate capital improvement.
The Court further finds that it misstated the effect of paragraph 2(D) in its memorandum of March 15, 1984. United States v. Mansion House, No. 80-1563C(1), slip op. at 13 (E.D.Mo. Mar. 15, 1984).
Reading paragraph 2(D) in the context of the remainder of paragraph 2; and considering a paragraph 2(D) alternate capital improvement as a substitute for a banquet facility and considering the cost of a banquet facility; and further considering the parties' reasonable expectations as to Towers' net expenditure obligation under paragraph 2, the language of the remainder of paragraph 2, and the remainder of the SRSA; the Court concludes that Towers is required to make a gross expenditure of $1,700,000 on the alternate capital improvement which it constructs pursuant to paragraph 2(D) (or a net expenditure of $1,200,000 after taking into account the Receiver's obligation to reimburse Towers $500,000 upon lien-free completion of the alternate capital improvement).

B. Qualification as to Type of Project.
Paragraph 2(D) gives Towers the option to construct, instead of a banquet facility, "any other capital additions or structural improvements to the South Tower which will enhance the value and economic viability of the South Tower." (SRSA, ¶ 2(D)(iii)). The sprinkler system is a capital addition. Without a modern sprinkler system, the South Tower as a hotel is functionally obsolete. With a modern sprinkler system, the South Tower as a hotel can satisfy the requirements of professional booking associations and can qualify for conventions. Given increased consumer consciousness regarding the risks of fires in large hotels and the corresponding need for modern sprinkler systems, a modern sprinkler system is a valuable marketing tool for the South Tower. Without a modern sprinkler system, insurance for the South Tower would be more expensive or unavailable. Thus, the Court finds that a sprinkler system enhances the value of the South Tower as a hotel property and increases the economic viability of the South Tower as a hotel.
A sprinkler system as a project fits within the literal language of paragraph 2(D)(iii). Nevertheless, the Receiver argues that a sprinkler system does not qualify as a paragraph 2(D)(iii) project when paragraph 2(D)(iii) is read in the context of the remainder of the SRSA and when the SRSA is read in the context of the Lease. The Receiver contends that Towers' obligation under paragraph 2(D) is in addition to and independent of Towers' obligations under the Lease, and that if Towers was required to construct the sprinkler system under the Lease, then Towers cannot use its construction of the sprinkler system to satisfy its obligation under paragraph 2(D). The Court agrees. The Receiver contends that Towers had to construct a sprinkler system in order to comply with its obligations under the Lease. Thus, the Receiver concludes that Towers cannot use its construction of a sprinkler system to satisfy its obligation under paragraph 2(D) of the SRSA. The Court agrees.
As the Court concluded above, paragraph 2 of the SRSA requires that Towers make a net infusion of $1,200,000 into the South *1021 Tower. This net infusion is in addition to and independent of Towers' obligation to infuse at least $1,800,000 into the South Tower under paragraph 7 of the SRSA. The infusion required by paragraph 7 appears to be a means to enforce Towers' obligations under Sections 5.2(a), 28, and 33.1 of the Lease.[2] In contrast, paragraph 2 creates an obligation on Towers' part that is not contained in the Lease. The parties clearly intended that, pursuant to paragraph 2, Towers would undertake to construct a capital improvement that it was not previously obligated to construct under the Lease. Thus, the Court concludes that Towers' obligation to infuse $1,200,000 into the South Tower pursuant to paragraph 2 is in addition to and independent of Towers' obligations under the Lease. Thus, a specific project can qualify under paragraph 2(D)(iii) of the SRSA only if Towers is not already required to construct that project under the Lease.[3]
The Receiver contends that Towers was obligated to construct a sprinkler system in the South Tower pursuant to Articles 9 and/or 12 of the Lease. Except as to an 8-page "Lease Modification," the SRSA does not alter the parties' obligations under the 74-page Lease. The "Lease Modification" does not alter Towers' obligations under Articles 9 and 12 of the Lease.[4] Towers' obligation to infuse $1,200,000 into the South Tower pursuant to paragraph 2 is in addition and independent of Towers' obligations under Articles 9 and 12 of the Lease. Thus, if Towers was required to construct a sprinkler system under Articles 9 and/or 12 of the Lease, then a sprinkler system cannot qualify as an alternate capital improvement under paragraph 2(D) of the SRSA.

i. The Lease, Insurance, and the Sprinkler System.
Section 12.1(a) of the Lease requires that Towers at its sole cost and expense maintain "comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in or about the premises or any part thereof...." Towers must maintain minimum insurance protection of not less than $1 million for individual injury, $3 million for injuries arising out of a single occurrence, and $1 million for property damage. (Lease, § 12.1(a)). Section 9.1 of the Lease requires that Towers at its sole cost and expense:

comply with, conform to and obey all present and future laws, ordinances, requirements, orders, rules and regulations of every duly constituted governmental authority having jurisdiction and of the departments, bureaus and officials thereof, and the orders, rules, regulations and requirements of any insurance underwriting board, insurance inspection bureau having jurisdiction, insurance company writing policies for the Premises, or any other body exercising similar functions, that may be applicable to Tenant's covenants and obligations hereunder or to the use or manner of use, occupancy, possession, operation or maintenance of the Premises or any part thereof, whether such laws, ordinances, *1022 requirements, orders, rules or regulations are extraordinary or ordinary or forseen or unforseen, other than the specific obligations imposed on Landlord pursuant to Section 5.1 hereof.
Lease, Section 9.1 (emphasis added).[5] Thus, if the insurance carriers for Towers' "comprehensive public liability insurance" would not provide Towers with its minimum insurance coverages without a sprinkler system or if the insurance carriers demanded a sprinkler system, then Towers was required to install a sprinkler system at its cost.
Section 12.2(a) of the Lease requires that the Receiver at his sole cost and expense maintain "insurance against loss or damage to the Premises by fire and extended coverage ..." (fire insurance). Section 9.2 of the Lease requires that the Receiver at his sole cost and expense:

comply with, conform to and obey all present and future laws, ordinances, requirements, orders, rules and regulations of every duly constituted governmental authority having jurisdiction and of the departments, bureaus and officials thereof, and the orders, rules, regulations and requirements of any insurance underwriting board, insurance inspection bureau having jurisdiction, insurance company writing policies for the Premises, or any other body exercising similar functions, to the extent that the same are the Landlord's obligations under other provisions of this Lease.
Lease, Section 9.2 (emphasis added). Thus, if the insurance carrier for the Receiver's fire insurance demanded a sprinkler system, then the Receiver was required to install a sprinkler system at his cost.[6]

ii. The Demand to Install the Sprinkler System.
In 1985, Towers' "comprehensive public liability insurance" carriers advised Towers that Towers could not obtain insurance in excess of $500,000 unless Towers installed a comprehensive sprinkler system. (Towers' Response to Court's Order of March 13, 1987, p. 2). The insurance carriers advised Towers that Towers had to install a sprinkler system by late spring 1986. (Plaintiff's Exhibit 20). In response, Towers installed the sprinkler system. The Receiver has not received any demand that the South Tower be sprinklered in order to fulfill his insurance obligations under the *1023 Lease. (Receiver's Response to Court's Order of March 13, 1987, ¶ 2.(b)).[7]

iii. Conclusion.
Towers was required to construct the sprinkler system in order to obtain the necessary minimum "comprehensive public liability insurance." Towers' "comprehensive public liability insurance" carriers demanded that Towers construct the sprinkler system. Thus, the Court concludes that Towers was obligated to construct the sprinkler system under Sections 9.1 and/or 12.1(a) of the Lease. Further, as Towers was obligated to construct the sprinkler system under the Lease, the Court concludes that Towers cannot use its construction of the sprinkler system to satisfy its obligation under paragraph 2(D) of the SRSA. The sprinkler system does not qualify as an alternate capital improvement under paragraph 2(D)(iii) of the SRSA.

C. Equitable Considerations.
As Towers was required to construct the sprinkler system under the Lease, the sprinkler system does not qualify as to the type of project which could satisfy Towers' obligation under paragraph 2(D) of the SRSA. As Towers is required to expend $1,700,000 on an alternate capital improvement and as Tower expended only $500,000 on the sprinkler system, the sprinkler system does not qualify as to cost under paragraph 2(D) of the SRSA. As Towers did not obtain prior written approval from HUD and the Receiver to treat the sprinkler system as the elected alternate capital improvement, Towers did not comply with the procedural requirement of paragrpah 2(D) of the SRSA.
Towers obtained the approval of HUD and the Receiver to construct the sprinkler system in the context of Towers' insurance carriers' demand that Towers construct a sprinkler system. (Plaintiff's Exhibit 20). Towers obtained this approval on February 18, 1986, over seven months before Towers decided not to construct a banquet facility and instead to construct an alternate capital improvement. Now, Towers attempts to characterize the sprinkler system, constructed before its decision, as the alternate capital improvement. This attempt may be a clever afterthought by Towers. Alternatively, Towers may have intentionally sandbagged HUD and the Receiver by obtaining approval for construction of the sprinkler system before Towers formally decided not to construct a banquet facility, but after Towers no longer intended to construct a banquet facility. In either case, when Towers obtained approval for and constructed the sprinkler system, Towers knew that HUD and the Receiver did not consider the sprinkler system to be a paragraph 2(D) alternate capital improvement.
Under the SRSA, the Receiver is entitled to have Towers construct one single project for $1,700,000. Towers should not be allowed unilaterally to break that up into several smaller projects.
In light of these considerations, the Court concludes that, in equity, Towers should not be credited with its expenditures on the sprinkler system towards its expenditure obligation under paragraph 2(D) of the SRSA.

Conclusion
Towers has not complied with its obligation under paragraph 2(D) of the Second Restated Settlement Agreement. Accordingly, Towers' motion to enforce the Second Restated Settlement Agreement is denied.
To fulfill its obligation under paragraph 2(D) of the Second Restated Settlement Agreement: Towers must obtain prior written approval from HUD and the Receiver to treat a specific project as the paragraph 2(D) alternate capital improvement; Towers must expend at least $1,700,000 on that project; and Towers must not be obligated to construct that project under the Lease or elsewhere under the SRSA.
NOTES
[1] Paragraph 2(D) is clearly a mistake to the extent that it purports to give Towers the right to "draw" upon the Escrow Funds to construct an alternate capital improvement. Towers must construct a project and then seek reimbursement from the Receiver after its lien-free completion. (SRSA, ¶¶ 2(C) and 2(G)).
[2] Paragraph 7 of the SRSA requires Towers to expend $1,800,000 on improvements, alterations, renovations, or restorations to the South Tower. Towers' expenditures for carpeting, draperies, painting, wall covering, fixtures, and equipment are all required by Section 5.2(a) of the Lease. Some of Towers' expenditures for painting and decorating may have been required by Article 28 of the Lease. Section 33.1 of the Lease required Towers to complete certain renovations, additions, improvements, and alterations. Towers' expenditure for a new outdoor sign was at Towers' option under Article 30.
[3] This conclusion comports with the well-known law school principle that: "You cannot submit the same term paper for two different courses."
[4] Paragraph 5 of the SRSA provides that the Lease is to be "clarified, modified and amended by executing, forthwith after the Effective date," a certain "Lease Modification." The "Effective date" was the date this Court approved the Settlement Agreement. (SRSA, ¶ 2(F)). The Court file does not contain an executed copy of the "Lease Modification" and the Court does not know if the parties have executed the "Lease Modification." As the "Lease Modification" does not alter Towers' obligations under Articles 9 and 12 of the Lease, for the purposes of this memorandum, it does not matter whether the parties have executed the "Lease Modification."
[5] Section 5.1 of the Lease does not require the Receiver to construct a sprinkler system. Thus, the proviso to Section 9.1 does not reduce Towers' obligation with respect to a sprinkler system.
[6] Section 12.9(a) of the Lease provides:

If Tenant's occupancy of the Premises, or the use to which Premises are being put by Tenant, or any act or omission by Tenant causes an increase in Landlord's insurance premiums for the premises, Tenant agrees to pay said increase as additional Rental when demanded by Landlord. Notwithstanding the foregoing, Tenant shall not bear and pay any increases in Landlord's insurance premiums occasioned solely by a general increase in insurance costs for that particular type of insurance. Tenant, however, shall bear and pay such increases only if they result from an increased risk attributable to Tenant's permitted uses hereunder, i.e., hotel, restaurant, cocktail lounge, etc. For example, if the premiums for fire and extended coverage insurance increases because of a general increase in losses from fires, such increases shall be borne solely by Landlord. If, on the other hand, the premiums for fire and extended coverage insurance, or any other insurance coverage required to be procured by Landlord hereunder, shall be increased because the risk of loss with respect to Tenant's permitted uses has increased, then Tenant shall solely bear and pay such increase upon demand.
Section 12.9(a) (emphasis added). Thus, if the insurance carrier for the Receiver's fire insurance demanded increased premiums because the South Tower is a hotel, then Towers would be required to reimburse the Receiver for those premiums. Arguably, if that insurance carrier for the Receiver's fire insurance demanded that the Receiver install a sprinkler system because the South Tower is a hotel (instead of demanding increased premiums), then Towers should be responsible for the cost of the sprinkler system. In light of the fact that it was Towers' comprehensive public liability insurance carriers that demanded the installation of the sprinkler system, (see Tower's Response to Court's Order of March 13, 1987, p. 2, and Plaintiff's Exhibit 20), the Court does not need to determine what effect Section 12.9(a) of the Lease would have had had the Receiver's fire insurance carrier demanded that the Receiver install a sprinkler system because the South Tower is a hotel.
[7] The record contains indications that the City of St. Louis wanted a sprinkler system installed in the South Tower. However, the City of St. Louis did not require the Receiver, as landlord, to install a sprinkler system.