**TOWERS HOTEL CORPORATION, a Corporation, Appellant,**

**v.**

**Gerald A. RIMMEL, Receiver, Mansion House Center Properties, Appellee.**

**No. 87–1896.**

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1988.

Decided April 5, 1989.

John Michael Clear, St. Louis, Mo., for appellant.

Gene Zafft, St. Louis, Mo., J. Christopher Kohn, Washington, D.C., for the U.S. (receivership) at the request of the Court.

Before ARNOLD, Circuit Judge, ROSS, Senior Circuit Judge, and WOLLE, District Judge.*

ROSS, Senior Circuit Judge.

Appellant Towers Hotel Corporation (Towers) appeals the district court's denial of Towers' motion to enforce the Second Restated Settlement Agreement (SRSA) which was executed between Towers and the appellee, Gerald A. Rimmel, the court-appointed Receiver (Receiver) of the Mansion House Center. Towers argues that the district court erred in refusing to order the immediate enforcement of the SRSA and in finding that Towers was not entitled to $500,000 held in escrow by the Receiver pursuant to paragraph 2(D)(iii) of the SRSA. For the reasons set forth below, we reverse and remand the case for further proceedings.

## BACKGROUND

This case concerns the South Tower of the Mansion House Center, which appellant Towers operates as a hotel in downtown St. Louis, Missouri. In 1978, Towers entered into a twenty-year renewable lease of the South Tower (Lease) with appellee Gerald A. Rimmel, the court-appointed Receiver of the Mansion House properties.[1] In 1980, Towers filed this action alleging that the Receiver had breached the Lease. The Receiver counterclaimed alleging wrongful conduct by Towers.

On January 19, 1984, after protracted negotiations in this lawsuit and other related Mansion House actions, Towers and the Receiver entered into the Second Restated Settlement Agreement (SRSA).[2] This agreement provided, inter alia, for the dismissal of all litigation between the parties (paragraph 3); for the execution of certain lease modifications (paragraph 5); for the crediting of certain rental payments (para-

---

* The Honorable Charles R. Wolle, United States District Court Judge for the Southern District of Iowa, sitting by designation.

1. As more fully described in United States v. Altman, 750 F.2d 684, 686–87 (8th Cir.1984), Gerald A. Rimmel was appointed as Receiver of the Mansion House Center on September 8, 1976, upon motion of the United States following the Owner–Partnerships' mismanagement of that property and default on HUD insured mortgage loans, totalling approximately $36 million. By virtue of this receivership, the district court has retained jurisdiction pursuant to Fed.R.Civ. P. 66.

2. The Second Restated Settlement Agreement (SRSA), which superseded the parties' prior "Restated Settlement Agreement" of April 27, 1983, was approved by the district court on March 14, 1984, with certain conditions. United States v. Mansion House Center, No. 76–20C(1), 1984 WL 5601 (E.D.Mo. Mar. 15, 1984). On appeal, this court affirmed the court's approval of the SRSA but rejected the conditions imposed by the district court. This court remanded the matter to the district court with directions to permit consummation of that agreement. United States v. Altman, supra, 750 F.2d at 697–98. Thereafter, following the parties' reaffirmation and extension of the SRSA on September 30, 1985, the district court approved the SRSA pursuant to Rule 66 of the Federal Rules of Civil Procedure. Towers Hotel Corp. v. Rimmel, No. 76–20C(1), 1985 WL 9422 (E.D.Mo. Dec. 2, 1985).

graph 6); and for the exchange of certain releases (paragraphs 8, 10, 11, 12, 13). Paragraph 7 also required Towers to expend at least $1.8 million for improvements and renovations to the South Tower.

Paragraph 2 of the SRSA further required Towers to construct a banquet facility adjacent to the South Tower. As the Receiver's capital contribution or "costs" for that facility, the Receiver agreed to escrow the sum of $500,000, which would be paid to Towers upon the lien-free completion of the project. Paragraph 2(D) provided, however, that if the lowest acceptable bid for the project exceeded $1.7 million or if Towers was unable to obtain acceptable financing for the project, then Towers had the right not to construct the facility. In that event, paragraph 2(D)(iii) of the SRSA provided that Towers would still be entitled to draw upon the escrowed $500,000 provided that it make certain other capital additions or structural improvements which would enhance the value and economic viability of the South Tower.

Although the SRSA was unconditionally approved by the district court on December 2, 1985, the parties to date have failed to consummate any of the various provisions of their agreement. This failure apparently has been primarily due to the present dispute concerning whether Towers' expense for the installation of a new sprinkler system in the South Tower is eligible for reimbursement from the escrow fund under paragraph 2(D)(iii).[3]

Installation of the sprinkler system began in the spring of 1986. In September 1986, as the sprinkler system neared completion, Towers elected under paragraph 2(D) not to construct the banquet facility because the lowest acceptable bid for such construction exceeded $1.7 million. After taking this election, Towers asserted that it was entitled to reimbursement for the new sprinkler system, claiming that the new system qualified as a "capital addition or structural improvement" under paragraph 2(D)(iii). The Receiver, however, refused

to recognize the sprinkler system as a reimbursable capital addition or structural improvement, claiming that the expense of the sprinkler system was already Towers' obligation under the terms of the Lease.

Thereafter, on December 5, 1986, Towers filed a motion in district court seeking enforcement of the SRSA and an order requiring the Receiver to release the $500,000 escrowed funds as reimbursement for its sprinkler system expenses. A hearing was held on January 20, 1987, and supplemental materials were subsequently filed with the court. On June 2, 1987, the district court denied Towers' motion to enforce the SRSA on the grounds that Towers had not complied with its obligation under paragraph 2(D) of the SRSA. Specifically, the district court concluded that under paragraph 2(D):

> Towers is required to obtain prior written approval, from both HUD and the Receiver, to *treat* a specific capital improvement *as* the alternate capital improvement to be constructed pursuant to paragraph 2(D) of the SRSA. Towers did not obtain such prior written approval. Further, and more importantly, the Court concludes that the sprinkler system does not qualify as an alternate capital improvement under paragraph 2(D) of the SRSA because: (1) Towers is required to expend $1,700,000 [the amount of the upset bid price] on an alternate capital improvement, and (2) Towers was required to construct the sprinkler system under the Lease.

*Towers Hotel Corp. v. Rimmel,* 661 F.Supp. 1013, 1051 (E.D.1987) (emphasis original). The district court also held that under paragraph 2(D), "the Receiver is entitled to have Towers construct one single project for $1,700,000. Towers should not be allowed unilaterally to break that up into several smaller projects." *Id.* at 1023. Towers now appeals.

DISCUSSION

A. Jurisdiction

■ Before addressing the merits of Towers' appeal, we first consider the

---

**3.** The sprinkler system was required by Towers' liability insurance carrier, and was installed with the approval of the Receiver and the De-

partment of Housing and Urban Development (HUD) at a cost exceeding $574,000.

threshold question of whether this court has jurisdiction. Towers asserts that appellate jurisdiction is conferred under 28 U.S.C. § 1292(a)(1), § 1292(a)(2), and the collateral order exception to § 1291. The Receiver, on the other hand, asserts that we have no jurisdiction because the district court's order was merely an administrative order relating to the implementation and consummation of the SRSA. We find that 28 U.S.C. § 1292(a)(1) and § 1292(a)(2) do not provide an appropriate basis for jurisdiction.[4] We conclude, however, that the collateral order exception to 28 U.S.C. § 1291 confers appellate jurisdiction in this instance.

28 U.S.C. § 1291, commonly referred to as the final judgment rule, provides that the courts of appeals have jurisdiction of appeals "from all final decisions of the district courts * * * except where a direct review may be had in the Supreme Court." As a general rule, an appeal may not be taken under § 1291 until the district court has rendered a decision that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). However, in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the Supreme Court recognized that there is a small class of decisions which are immediately appealable under § 1291, although such decisions do not terminate the proceedings before the district court. *Id.* at 546, 69 S.Ct. at 1225. The Supreme Court held that decisions which fall into this exception, now commonly referred to as the collateral decision exception or doctrine, are those which "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudi-

cated." *Id.* More recently, in *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), the Supreme Court held that "[t]o come within the 'small class' of decisions excepted from the final-judgment rule by *Cohen*, the order must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Id.* at 468, 98 S.Ct. at 2458 (citations and footnote omitted).

In this case, the district court's order satisfies the criteria of the collateral order doctrine. First, the order conclusively determined the parties' rights vis-a-vis one another, and set forth a clear and final interpretation of paragraph 2(D) of the SRSA.

Second, by interjecting certain preconditions, the order resolves the important issue of when Towers is entitled under paragraph 2(D) to the $500,000 escrowed by the Receiver. The issue of Towers' entitlement to this fund is unquestionably separate from the merits of the underlying action in which Towers alleged breach of the South Tower Lease and the Receiver counterclaimed for wrongful conduct under the Lease. The escrow fund now in issue was negotiated and established subsequent to the lease disputes and conduct giving rise to the underlying action. Therefore, there is no danger that this court's review of the district court's interpretation of the SRSA would involve "considerations that are 'enmeshed in the factual and legal issues comprising the [parties'] cause[s] of action.'" *Coopers & Lybrand, supra*, 437 U.S. at 469, 98 S.Ct. at 2458 (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558, 83 S.Ct. 520, 522, 9 L.Ed.2d 523 (1963)) (footnote omitted).

---

**4.** 28 U.S.C. § 1292(a)(1) confers appellate jurisdiction over interlocutory orders arising from injunctive proceedings. In the present case, the order appealed from did not arise from an injunctive proceeding.

28 U.S.C. § 1292(a)(2) confers appellate jurisdiction over "[i]nterlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." The order appealed from does not, in our view, fall into one of these specifically enumerated categories.

Third, as a practical matter, the district court's order will not be subject to review "on appeal from a final judgment" at a later point in time. The parties' settlement agreement, in which the parties agreed to dismiss the underlying causes of action, has been approved and is binding upon them, notwithstanding the fact that they have failed to carry out their stated intentions. *See Gatz v. Southwest Bank of Omaha*, 836 F.2d 1089, 1095 (8th Cir.1988). *See also* 6 A. Corbin, *Corbin on Contracts* § 1286 (1962). By virtue of this agreement, there is no prospect of any further district court proceedings resulting in a "final judgment" with respect to the parties' original claims.

Lastly, we believe that any further delay in conclusively determining the parties' rights under paragraph 2(D) of the SRSA or Towers' right to enforcement of the remaining provisions of the SRSA would result in a great injustice to the overall resolution of this protracted litigation and receivership. Because these issues are sufficiently important, and for the reasons stated above, we conclude that the collateral order exception to § 1291 confers appellate jurisdiction in this case.

### B. Interpretation of the SRSA

The parties agree that the sole issue which has prevented implementation of the SRSA is the proper interpretation of paragraph 2(D)(iii) of the SRSA, i.e., whether, and under what circumstances, Towers is entitled to receive the $500,000 escrow funds. Paragraph 2(D) provides in full:

(D) In the event the lowest acceptable bid exceeds $1,700,000 or Towers has not obtained a loan commitment from a financial institution in an amount and upon terms acceptable to Towers and sufficient to construct the Facility, *Towers will have the right to draw upon the Escrow Funds, to be applied at its election, subject to the approval of the United States Department of Housing and Urban Development ("HUD"), in accordance with the requirements of the HUD Regulatory Agreement as defined in Section 1.2(u) of the South Tower Lease, dated November 16, 1978, as amended (the "Lease") and approved in accordance with the terms of the Lease, for the following:* (i) energy conversion and/or improvement to the boiler-equipment room servicing the South Tower complex including the south commercial premises; (ii) installation of outside elevators; or *(iii) any other capital additions or structural improvements to the South Tower which will enhance the value and economic viability of the South Tower.*

(Emphasis added.)

The district court found that this paragraph, when read in conjunction with the Lease, the HUD Regulatory Agreement and the remainder of the SRSA, (1) required Towers to "obtain prior written approval from HUD and the Receiver to treat a specific project as [a] paragraph 2(D) alternate capital improvement," (2) entitled the Receiver "to have Towers construct one single project," (3) required Towers to expend "at least $1,700,000 on that project," and (4) did not permit a project to qualify as an alternate capital improvement under paragraph 2(D)(iii) if Towers was already required to construct that project under the Lease. *Towers Hotel Corp. v. Rimmel, supra*, 661 F.Supp. at 1023. Towers argues that the district court's interpretation of paragraph 2(D) impermissibly imposes certain preconditions which were never intended nor bargained for by the parties. Towers further asserts that the district court erred by focusing solely on paragraph 2(D) and failing to order, or even address, the enforcement of the remaining undisputed provisions of the SRSA, such as the agreed modifications to the Lease, exchange of releases, proof of escrowed funds, and dismissal of the cases.

We first note the standard of review which guides us. "To the extent the district court's construction of the [settlement agreement] and its legal effect relies on the contract terms and not on extrinsic evidence, its interpretation is a conclusion of law over which we have plenary review." *American Business Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1142 (8th Cir. 1986) (citation omitted). "To the extent

that the meaning of the contract depends on disputed extrinsic evidence, however, it constitutes a finding of fact, subject to review on appeal under the clearly erroneous rule, Fed.R.Civ.P. 52(a). District court findings as to what the parties said or did must also be accepted on appeal unless clearly erroneous." *Arkansas Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 567 (8th Cir.1986) (citations omitted).

(1) *Minimum Expenditure Requirement*

■ We now address the district court's finding that Towers must expend a minimum of $1.7 million on alternate capital improvements in order to draw upon the escrow funds. In reaching this conclusion, the district court reasoned:

> Just as paragraph 2(D) does not state how much Towers must expend on an alternate capital improvement, no provision of paragraphs 2(A) or 2(B), or any other part of the SRSA, states how much Towers must expend on a banquet facility. However, paragraph 2(D) provides that if the lowest acceptable bid for a banquet facility exceeds $1,700,000, then Towers does not have to build a banquet facility. On the basis of this "upset figure," the parties have consistently and uniformly agreed that Towers must expend $1,700,000 on a banquet facility. * * * [A]fter lien-free completion of a banquet facility and after certification of the cost, the Receiver is required to pay Towers the $500,000 in Escrow Funds. (SRSA, ¶¶ 2(C) & 2(G)). Thus, Towers' net expenditure on a banquet facility is supposed to be $1,200,000.
>
> \* \* \* \* \* \*
>
> The parties agree that an alternate capital improvement under paragraph 2(D) is to be a substitute for a banquet facility under paragraphs 2(A) and 2(B). The Court believes that, as a substitute for a banquet facility, the cost of an alternate capital improvement should be roughly the same as the cost of a banquet facility. The parties agree that Towers is required to make a gross expenditure of $1,700,000 on a banquet fa-

cility (or a net expenditure of $1,200,000). This indicates that Towers is required to make a gross expenditure of $1,700,000 on an alternate capital improvement (or a net expenditure of $1,200,000).

*Towers Hotel Corp. v. Rimmel, supra,* 661 F.Supp. at 1019. The district court specifically rejected Towers' argument that it was required to expend only $500,000, the amount of the escrow fund (or a net expenditure of $0), on an alternate capital improvement, stating:

> It is inconceivable that the Receiver intended to agree to give Towers the option of making a net infusion of $1,200,000 into a banquet facility or making a net infusion of $0 into an alternate capital improvement. In contrast, it is perfectly reasonable for Towers to intend to agree to make a net infusion of $1,200,000 either into a banquet facility or into an alternate capital improvement which would enhance the value and economic viability of the South Tower.

*Id.* at 1019. The district court found that specific language contained in the SRSA, such as "Receiver's contribution toward the costs to construct the Facility or [alternate capital improvements] * * *" in paragraph 2(C), and similar language found in paragraph 2(G), "clearly indicate[s] that Towers is required to make some positive net expenditure and net infusion into the South Tower pursuant to paragraph 2(D)." *Id.* at 1019.

Although the district court's finding that Towers must make some positive net expenditure pursuant to paragraph 2(D) is reasonable, the district court's conclusion that Towers must expend a *minimum* of $1.7 million on either a banquet facility or alternate capital improvements is erroneous and unsupported by the language of paragraph 2(D), the remaining portions of the SRSA, or the parties' bargaining history. Specifically, we reject the district court's finding that "the parties have consistently and uniformly agreed that Towers must expend $1,700,000" on either of these projects. To the contrary, we find it clear from the language of paragraph 2(D) and the parties' bargaining history that the $1.7

million upset bid figure was inserted to define the maximum, not minimum, that Towers would be obligated to expend on the construction of a new banquet facility. If, in fact, Towers had received a suitable construction bid for an amount less than $1.7 million, there is nothing in the language of paragraph 2(D) or the SRSA which would have precluded Towers' entitlement to draw upon the escrow fund after the lien-free completion of the project.

Our conclusion as to the $1.7 million cap, however, does not resolve the issue of what, if any, minimum net expenditure Towers must make in order for it to be eligible to draw upon the escrow funds. Towers asserts that it need not make any minimum amount of qualifying expenditure, arguing that it may withdraw from the escrowed funds any amount it expends on projects constructed under paragraph 2(D)(i)–(iii) of the SRSA, up to $500,000. We find this assertion by Towers to be flawed. We agree with the district court that the language of paragraphs 2(C) and 2(G), which refers to the Receiver's contribution toward costs, strongly suggests that some positive net expenditure by Towers was intended when the parties negotiated and drafted the SRSA. Nevertheless, under the facts of this case, we find it unnecessary to determine precisely how much of a positive net expenditure is required.

It is undisputed that Towers has in fact expended more than $3.5 million on improvements and alterations to the South Tower since the execution of the SRSA, in satisfaction of the $1.8 million expenditure requirement under paragraph 7 of the SRSA, which is in addition to its expense for installing the sprinkler system. It is also undisputed that such improvements have, in large part, been responsible for

Towers' success in generating substantial revenue for itself and for the Receiver's benefit. We believe that these facts, which were not discussed by the district court in its memorandum opinion, are evidence of Towers' commitment to the economic viability of the South Tower and its good faith dealing with the Receiver. We give such evidence great weight in deciding that whatever positive net expenditure was required of Towers pursuant to paragraph 2(D), Towers' expenditures on the sprinkler system and on other improvements and additions to the South Tower have satisfied that requirement.

### (2) *Approval Requirements*

■ Next, we address the district court's finding that Towers was required to obtain prior written approval from HUD and the Receiver to treat the sprinkler system, or any specific project, as a paragraph 2(D) alternate capital improvement. In reaching this conclusion, the district court relied upon the terms of paragraph 2(D),[5] the HUD Regulatory Agreement[6] and the South Tower Lease, as amended.[7] The district court concluded that paragraph 2(D) gave HUD and the Receiver a right of approval, both as to Towers' "right to draw upon the Escrow Funds" and its choice of alternative capital improvements to which the escrow funds would be applied. The district court specifically rejected Towers' argument that paragraph 2(D) only requires Towers to obtain prior approval from HUD and the Receiver for the construction of a given capital improvement, finding that such a reading "does not require any approval more than that which Towers is already directly required to obtain under the Lease" and "renders paragraph 2(D)'s approval requirement total

---

**5.** The approval provision of paragraph 2(D) provides as follows: "Towers will have the right to draw upon the Escrow Funds, to be applied at its election, subject to the approval of [HUD] * * * and approved in accordance with the terms of the Lease * * *."

**6.** Paragraph 6(d) of the HUD Regulatory Agreement provides as follows: "Owners shall not without the prior written approval of the Commissioner: (d) Remodel, add to, reconstruct

* * * any part of the mortgaged property * * *."

**7.** Paragraph 6.2(b) of the Lease provides as follows: "[N]o single project * * * involving an estimated cost in excess of $50,000.00 * * * shall be commenced * * * by Tenant unless: (b) Such Change shall be * * * approved in writing by [Receiver] prior to the commencement of such Change, which approval [Receiver] shall not reasonably withhold."

surplusage." *Towers Hotel Corp. v. Rimmel, supra,* 661 F.Supp. at 1016.

We find the district court's interpretation of the approval provisions of paragraph 2(D) is unduly restrictive and overlooks the fact that the primary underlying purpose of the approval provision was satisfied in this case. Nowhere in the language of paragraph 2(D) is an express duty imposed upon Towers to obtain any approval which is above and beyond that already required of Towers under the HUD Regulatory Agreement and the Lease. Nor do we find evidence that the parties ever negotiated or intended such a duty. In fact, the record indicates that the Receiver's theory (that Towers is required to obtain specific approval to *treat* any project as a qualifying alternate capital improvement) was first advanced by the Receiver and HUD *after* the SRSA was executed and approved when it became apparent that the banquet facility would not be built and that alternate projects might be proposed in its place. The district court's interpretation grants to the Receiver greater rights than those that were intended by the parties' agreement.

Furthermore, at oral argument, the parties acknowledged that the purpose of inserting the approval language into paragraph 2(D) was to give the Receiver the right to reject any building proposals which he deemed to be unreasonable or unsuitable in terms of enhancing the long-term viability of the South Tower. The Receiver admitted that the sprinkler system was the type of project which would enhance the long-term economic value and viability of the South Tower, and that he and HUD did in fact approve the installation of the sprinkler system into the South Tower. Based on these factors we conclude that the purpose and intent of the approval language of paragraph 2(D) was satisfied in this instance. We further conclude that paragraph 2(D) simply requires Towers to obtain whatever approval is required under the HUD Regulatory Agreement and Lease, that the required approval was in fact obtained by Towers, and that the district court erred by imposing additional ap-proval constraints on Towers' right to draw on the escrow funds.

### (3) *Obligations Under the Lease*

■ We next consider the district court's finding that the sprinkler system does not qualify as an alternate capital improvement under paragraph 2(D)(iii) of the SRSA because Towers was already obligated to construct the sprinkler system under the terms of the Lease. In reaching this conclusion, the district court first acknowledged that the sprinkler system was the type of capital addition or improvement which fits within the literal language of paragraph 2(D)(iii). The court determined, however, that since Towers was already required to build the sprinkler system under the terms of the Lease, the sprinkler system could not qualify as a reimbursable alternate capital addition or improvement under paragraph 2(D)(iii).

■ We need not consider whether Towers in fact was required to construct the sprinkler system under the terms of the Lease. We find the district court incorrectly found that any expenditure required under the Lease was precluded from qualifying as an alternate capital improvement under paragraph 2(D)(iii) of the SRSA. Such a constraint is neither found in nor supported by the express language of paragraph 2(D), nor any other portion of the SRSA. Paragraph 2(D)(iii) requires only that the alternate capital addition or improvement "enhance the value and economic viability of the South Tower." Both the district court and the appellee admit that the sprinkler system meets that requirement. We are confident that had the parties intended any further constraints, the SRSA would have been drafted so as to reflect those intentions. In any event, a court is not free to save parties from what it believes are contractual mistakes or oversights. *See Morello v. Federal Barge Lines, Inc.,* 746 F.2d 1347, 1351 (8th Cir. 1984). Therefore, we hold it was error for the district court to impose upon the parties' agreement this additional condition.

#### (4) *Single Project Requirement*

■ Next, we consider the district court's findings that under paragraph 2(D) "the Receiver is entitled to have Towers construct one single project," and that Towers may not unilaterally divide that project up into several smaller projects. It is fairly clear that the district court did not interpret paragraph 2(D) as requiring that only a single alternate capital addition or improvement be built; rather, the district court interpreted paragraph 2(D) as giving the Receiver the right to determine whether a single project or several smaller projects should be built in lieu of the banquet facility. Again, we find that the district court's interpretation is incorrect because nowhere in the express language of the SRSA have the parties granted the Receiver such decision-making and approval powers. As with the other provisions discussed above, the district court has impermissibly granted to the Receiver greater rights than were granted to him by the parties' agreement.

In conclusion, we agree with Towers that the district court's interpretation of paragraph 2(D) erroneously imposed constraints or "preconditions" upon Towers' ability to qualify alternate capital additions or improvements. Those constraints were not authorized by the express language of the SRSA nor contemplated by the parties at the time they entered into the SRSA.

> [I]n interpreting contracts, courts must be guided by the well established rule that they cannot make contracts for the parties or insert provisions by judicial construction, and they are to determine what the parties intended by what they said and not by what they might have said or what perhaps they should have said.

*Morris v. Granger*, 675 S.W.2d 15, 17 (Mo. App.1984) (citations omitted). Furthermore,

> [a]n implied obligation will not be inserted into a written contract unless it appears that it was so clearly within the

contemplation of the parties that they deemed it unnecessary to expressly state it in the contract, or it must appear that the implied obligation is necessary to effectuate the full purpose of the contract. *Henderson v. Brown Elec. Supply Co.*, 555 S.W.2d 635, 639 (Mo.App.1977). We therefore reverse the district court's interpretation of paragraph 2(D) imposing the constraints outlined above. We also reverse the district court's finding that the South Tower sprinkler system does not qualify as a reimbursable capital addition or improvement under paragraph 2(D) of the SRSA, and we remand the matter to the district court with directions that the Receiver be ordered to allow Towers to withdraw the $500,000 held in escrow as reimbursement for its costs for the sprinkler system.

#### C. Enforceability of Other SRSA Provisions

Towers also urges us to find that the district court erred in refusing to order the immediate enforcement of the remaining provisions of the SRSA. Towers argues that the district court focused solely on whether the sprinkler system qualified as a paragraph 2(D)(iii) capital addition and failed to consider whether the Receiver should be compelled to effectuate the remaining provisions of the SRSA.[8] Towers asserts that none of those provisions is dependent upon the completion of a banquet facility (or alternate capital addition or improvement under paragraph 2(D)(iii)), and thus no impediment exists to preclude the enforcement of those provisions.

■ We note that although Towers' motion generally requested enforcement of the SRSA, Towers' brief in support thereof focused almost exclusively on Towers' rights and obligations under paragraph 2(D). We cannot fault the district court for failing to address the issue of enforceability of the remaining SRSA provisions which was not specifically raised by Towers in its brief. Therefore, we find no error in this

---

**8.** Towers refers to paragraphs contained in the SRSA which provide for lease modifications, rent credits, establishment of an escrow ac-

count, exchange of releases, and dismissal of the parties' respective causes of action.

regard. On remand, however, we request that the district court consider Towers' motion to enforce the remaining provisions of the SRSA. While we express no opinion on that matter, we note that the Receiver has failed to explain to this court's satisfaction his justifications for refusing to effectuate those provisions of the SRSA which are not dependent upon or related to the dispute over Towers' rights and obligations under paragraph 2(D). Unless the Receiver has firm legal grounds for his refusal to effectuate those provisions of the agreement, Towers' motion for the immediate enforcement of the remaining provisions of the SRSA should be granted.

During the course of this receivership over the past 13 years, the debt to HUD has increased by over $10 million. Close to $3 million has been paid in Receiver and attorneys' fees and expenses. The interest on the remaining debt to HUD accumulates at a rate in excess of $150,000 per month. The district court should consider whether it is time for this receivership to end and for the United States to be allowed to cut off further losses on this project.

Accordingly, we reverse and remand this case for further proceedings as outlined in our discussion above.