**Phillip A. BOYER, Appellant,**

v.

**INDEPENDENCE MANOR CARE CENTER, INC., et al., Respondents.**

**No. WD 37900.**

Missouri Court of Appeals, Western District.

Dec. 16, 1986.

Sherwin L. Epstein and Brian Timothy Meyers (Epstein and Meyers, of counsel), Kansas City, for appellant.

George A. Barton and Roger P. Wright (Shughart, Thomson & Kilroy, of counsel), Kansas City, for respondents.

Before BERREY, P.J., and PRITCHARD and DIXON, JJ.

PRITCHARD, Judge.

The issue is whether the trial court properly entered summary judgment against Phillip A. Boyer, M.D., upon his claim for damages arising out of alleged wrongful interference with his physician-patient relationship with residents of respondent's nursing home. The petition names the

nursing home and Kim Collins, its administrator, as defendants. Count I of the petition alleges that 42 residents of the nursing home were Dr. Boyer's patients, and that defendants, knowing of that relationship, "and intending to injure, destroy and otherwise interfere with said physician-patient relationship, did wrongfully, fraudulently, knowingly, intentionally, maliciously and without just cause or excuse, persuade and procure the above-named patients or their legal representatives or guardians to terminate the physician-patient relationship * * and induced said patients, or their legal representatives or guardians, to enter into a physician-patient relationship with Dr. Broughton, House Physician" (for the nursing home). Count II is for an injunction against continuing interference between Dr. Boyer and his patients. Count III alleges a conspiracy between defendants and other employees to terminate Dr. Boyer's relationship with his patients. Count IV is also one for damages for wrongful interference with the physician-patient relationship, it being further alleged that Kim Collins advised Dr. Boyer by letter that he would not be allowed on the premises of the nursing home.

Dr. Boyer became house physician and medical consultant for Independence Manor in 1980 when it first opened. Over the past 10 years he had been house physician or medical doctor for six large nursing homes in the Kansas City area. Independence Manor is licensed as an intermediate care facility which, according to Dr. Boyer, is not required to have a medical director, but many do have them to give medical advice. Dr. Boyer was paid $50 per month as medical advisor, but nothing as house physician. Most of the patients were over age 70, and most had responsible parties (guardians, family or friends) with whom Dr. Boyer dealt directly, and who would choose whether he would be the physician for the patients, and who were billed directly by him for his services. At first Dr. Boyer visited the nursing home weekly, but as the number of patients increased, he visited twice weekly and arranged his schedule so that he could see a given patient about once a month.

On February 20, 1984, Kim Collins wrote to Dr. Boyer stating that as of March 1, 1984, Independence Manor would no longer require his services as the House Physician, advising, "If any of your patients request your service, we will inform you. Any discussion regarding this matter will be with me." On March 1, two days after receiving the letter, Dr. Boyer went to the nursing home where he noticed that a Dr. Broughton's name was on the charts of all his then 42 patients. Kim Collins was not at the facility that day, so he went to see three of his patients whom he felt to be alert, asked them what had happened and they responded that they had been told that he was retiring and another doctor had taken over their care.

Kim Collins then wrote to Dr. Boyer: "On March 1, 1984, you arrived at Independence Manor Care Center at 8:00 a.m. to see the residents, which are no longer under your care, causing them undue stress. For the record, all responsible parties were contacted and given the option of continuing with your services or another physician. They all chose the latter. Due to the problems created by your unannounced visit on March 1st to Independence Manor, where you no longer have residents under your care, it is felt that the unharmonious effect that you created cannot and will not be tolerated. We do not choose to use alternative methods to restrain you from this facility, however, the choice is yours."

The deposition of Kim Collins was before the court. She began receiving complaints about Dr. Boyer in the summer of 1983, which became worse in December, that he would have slurred speech when nurses would call him on weekends; one family complained that he was rude, and he would lose his temper when they called him. He did not follow patients to the hospital, but he explained he was not on the staff of any Independence hospital where most patients wanted to go. Collins did not inform Dr. Boyer of any complaints because she felt it would not improve the situation. Collins

began contacting persons regarding Dr. Boyer's termination in the middle of February, 1984, advising them that the facility was changing house physicians and they had a choice to change to him, stay with Dr. Boyer, or choose another doctor. She did not encourage persons to change; she just told them the facts; but none of the responsible parties chose to remain with Dr. Boyer.

The depositions of James Verkist and James Ketterman, responsible parties for two patients of Dr. Boyer, indicate only that they discharged him because they were dissatisfied with his services, and not because he was terminated as house physician for the facility. The testimony of Dr. Broughton does not indicate any criticism or adverse reflection of Dr. Boyer's treatment of his patients, based on a review of their records and his observation of them.

Contrary to the testimony of Kim Collins, that of William DeHass, responsible party for Sarah DeHass, indicates that he was told by Collins only that Dr. Boyer was no longer house physician, the new physician would be Dr. Broughton. DeHass felt that he had no choice in the matter.

■■■ The elements of the cause of action for the tort of intentional interference with a contract or valid business relationship are stated in *C & M Developers, Inc. v. Berbiglia, Inc.*, 585 S.W.2d 176, 183[6] (Mo.App.1979), quoting *Salomon v. Crown Life Ins. Co.*, 536 F.2d 1233, 1238 (8th Cir.1976), to be " '(1) A contract or a valid business relationship or expectancy (not necessarily a contract); (2) Defendant's knowledge of the contract or relationship; (3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) The absence of justification; and (5) Damages resulting from defendant's conduct.' " Elements (1) and (2) are clearly established by the evidence before the trial court that Dr. Boyer had an on-going physician-patient relationship with 42 patients and his services were billed directly to them or their responsible parties; and respondents had knowledge of that relationship. The third element, the intentional interference by respondents which induced the breach of the relationship, might be lacking if the testimony of Kim Collins be accepted that she merely advised all responsible parties of the change of house physicians and gave them their choice of whom they wanted to retain. In view, however, of the testimony of De-Hass that he was given no choice, and the testimony of Dr. Boyer that three of his patients told him (although of hearsay nature at this stage) that they had been told he had retired and another doctor had taken over their case, the fact of no interference does not appear by unassailable proof. Dr. Boyer should be entitled to present the testimony of all responsible parties as to what actually happened with respect to the change of doctors. It is significant here that none of the 42 patients, or their responsible parties, terminated Dr. Boyer's services by any method mentioned in *Noren v. American School of Osteopathy*, 223 Mo.App. 278, 2 S.W.2d 215, 222[15] (1928), "[I]t is the undoubted rule that, unless the terms of the employment of a physician limit the extent of his services, or a reasonable notice is given the patient that he will not undertake subsequent treatment, the relation of physician and patient continues until the doctor's services are no longer needed, unless ended by mutual consent, or revoked by dismissal. (Citing cases.)"

Although the trial court found that no genuine issue of fact existed, it emphasized a basis for its dismissal that Independence Manor had a direct economic interest to protect, thus justifying any interference between Dr. Boyer and his patients. It stated, "It was very much in Defendants' interest to assure the quality of medical care they were providing their patients and there is no evidence in the file that improper means were used." There is no evidence in the record that Dr. Boyer's care of his patients was below par or of poor quality. Independence Manor is not jeopardized with statutory penalties such as, for example, failing to provide care to residents "under the direction of a licensed physi-

cian" as required by § 198.006, RSMo 1978. Indeed, as medical advisor, Dr. Boyer was a licensed physician. There is no evidence in the record that the nursing facility was adversely affected by Dr. Boyer's activities which would be violative of § 198.-088(1)(6)(c) RSMo 1978, which provides that a resident be fully informed by his physician of his health and medical condition and be afforded the opportunity to participate in the planning of his total care and medical care or treatment and to refuse treatment.

Respondents argue that because Dr. Boyer did not consult patient families before changing medications, he violated provisions of § 198.088 RSMo 1978, which might lead to respondents' civil liability. Nothing in that section requires such consultation. Collins testified that when nurses called Dr. Boyer on weekends, he would have slurred speech and appeared to be under the influence of alcohol, but she had never seen him at the facility in that condition. Dr. Boyer denied that he had any alcoholic problem. Other charges against Dr. Boyer that he was rude to patients and families, that he lost his temper when telephoned, and that the doctors he had cover for him when out of town were not satisfactory, if of any significant nature as to his professional services, have been denied by him. Furthermore, no record was made by respondents as to any such complaints or grievances by respondents as required by § 198.088(5) RSMo 1978. In short, genuine issues of fact pervade in the record of this case, causing summary judgment to be an inappropriate remedy. As was said in *Wickes Lumber Company v. Richmond Construction, et al.*, 690 S.W.2d 488, 490[1] (Mo.App.1985), "A genuine issue of fact exists whenever there is the slightest doubt as to the facts, so long as the fact in doubt is a material one which has legal probative force as to a controlling issue."

The judgment is reversed and the case is remanded for further proceedings and trial on the merits.

All concur.