767 F.Supp. 995 (1991)
UNITED STATES of America, Plaintiff,
v.
MANSION HOUSE CENTER, et al., Defendants.
TOWERS HOTEL CORPORATION, Plaintiff,
v.
Gerald A. RIMMEL, Receiver, Mansion House Center Properties, Defendant.
Gerald A. RIMMEL, Receiver, Mansion House Center Properties, Plaintiff,
v.
TOWERS HOTEL CORPORATION, Defendant/Counterclaimant/Third-Party Plaintiff,
v.
HALLMARK INVESTMENT CORPORATION, Third-Party Defendant.
Nos. 76-20C(1), 80-1563C(1) and 90-915C(1).
United States District Court, E.D. Missouri, E.D.
July 8, 1991.
*996 Joseph B. Moore, Asst. U.S. Atty., U.S. Dept. of Justice, St. Louis, Mo., J. Christopher Kohn, Atty., Civil Div., U.S. Dept. of Justice, Washington, D.C., Donald Flint, Area Counsel, Dept. of Housing & Urban Development, St. Louis, Mo., for U.S.
Lawrence Sanders, Linclay Corp., St. Louis, Mo., Trustee in Bankruptcy.
James Matchefts, Lewis, Rice & Fingersh, Clayton, Mo., for Peter and Gail McCann.
Norha Ryan, Susman, Schermer, Rimmel & Shifrin, Richard Greenberg, Rosenblum, Goldenhersh, Silverstein & Zafft, Clayton, Mo., for Rimmel, Receiver.
Charles Tureen, Gallop, Johnson & Neuman, St. Louis, Mo., for Value Properties.
*997 John Michael Clear, Michael E. Kohn, Erwin Switzer, III, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for Towers Hotel Corp.
Dick Sher, Peper, Martin, Jensen, Maichal & Hetlage, St. Louis, Mo., for Hallmark.

MEMORANDUM
NANGLE, District Judge.
Having considered the parties' briefs, the exhibits before the Court, and the entire record in these matters, and being fully advised in the premises, the Court makes the following findings of fact and conclusions of law.

I. The Second Restated Settlement Agreement

FINDINGS OF FACT
1. On January 19, 1984, Towers (by its president, Norman Probstein), the Receiver, and their counsel signed the "Second Restated Settlement Agreement" in Towers Hotel Corporation v. Rimmel, 80-1563C(1).
2. The effective date provisions of the SRSA read as follows:
1. This Second Restated Settlement Agreement (the "Agreement") shall not be effective until approved by the United States District Court for the Eastern District of Missouri, Eastern Division ("Court"), by issuance of appropriate orders in this lawsuit and a consolidated action bearing Cause Number 76-20C(2), copies of such orders shall be supplied to Towers and Receiver. If the Court fails or refuses to approve this Agreement by June 1, 1984, it shall be null, void and of no effect, unless the date for such approval shall be extended by written instrument by the parties.... (SRSA, p. 2)
[2.] (F) "Effective Date" means the date on which this Agreement is approved by the United States District Court for the Eastern District of Missouri, Eastern Division, by issuance of appropriate orders in this lawsuit and in a consolidated action bearing Cause Number 76-20-C(2). (SRSA, p. 4)
3. On March 15, 1984, 1984 WL 5601, this Court issued an order and memorandum which provided in part:
IT IS FURTHER ORDERED that the Receiver/Towers Second Restated Settlement Agreement be and is approved subject to HUD and the Owner Partnerships accepting the three (3) conditions attached to the approval of the HUD/Owners Revised Settlement Agreement.
4. The Court's March 15, 1984 memorandum indicates the Court's interpretation of the effective date provisions of the original and second restated settlement agreements. As to the original RSA, the Court summarized the effective date provisions as follows:

¶ 1. Effective upon Court approval. Null if not approved by June 1, 1983. Can be extended by written agreement.... (RSA, p. 10)
[¶ 2] (F) "Effective Date"When Towers receives both an acceptable bid and adequate financing. (RSA, p. 11)
As to the SRSA, the Court characterized the amended effective date provisions as follows:
Paragraph 2(F), which defines "Effective Date," is changed to define that term as simply the date that this Court approves the Receiver/Towers SRSA. The language about the "Effective Date" not occurring until both an acceptable bid and adequate financing are received is deleted ... Paragraph 3 is changed to specify that the "Effective Date," i.e., this Court's approval of the agreement, must occur before June 15, 198[4].... (SRSA, p. 13)
.... HUD/Owners' waiver of objections [to the South Tower lease and the Receiver/Towers RSA] and the "Effective Date" of the Receiver/Towers SRSA will occur simultaneously ... This Court approves the Receiver/Towers SRSA subject to HUD and the Owner Partnerships accepting the three conditions attached to approval of the HUD/Owners RSA. (SRSA, p. 15)
*998 5. By its opinion dated December 17, 1984 in United States v. Altman, etc., 750 F.2d 684 (8th Cir.1984), the United States Court of Appeals for the Eighth Circuit remanded the instant case to this Court with directions to "permit consummation of both the foreclosure settlement agreement and the Receiver/Towers Second Restated Settlement Agreement without the conditions imposed by the district court's order of March 15, 1984." Id. at 698.
6. On November 1, 1985, the Receiver and Towers made a joint application for the Court's consent to consummation of the SRSA. This application included a "Reaffirmation and Extension of Second Reinstated Settlement Agreement" which extended to December 31, 1985 the date by which Court approval was necessary.
7. By its order dated December 2, 1985, the Court approved the SRSA.
8. After this Court denied, on June 2, 1987, Towers' motion to enforce the SRSA, which focused specifically on the provisions governing $500,000 placed in escrow by the Receiver for use in capital improvements to the South Tower, the case was again appealed to the Eighth Circuit. The Court of Appeals again reversed and remanded, treating primarily the escrow issue, but also noting:
The parties' settlement agreement, in which the parties agreed to dismiss the underlying causes of action, has been approved and is binding upon them, notwithstanding the fact that they have failed to carry out their stated intentions.
Towers Hotel Corporation v. Rimmel, 871 F.2d 766, 770 (8th Cir.1989); also:
While we express no opinion on [Towers' motion to enforce as it applies to the rest of the SRSA], we note that the Receiver has failed to explain to this court's satisfaction his justifications for refusing to effectuate those provisions of the SRSA which are not dependent upon or related to the dispute over Towers' rights and obligations under paragraph 2(D) [concerning the escrow]. Unless the Receiver has firm legal grounds for his refusal to effectuate those provisions of the agreement, Towers' motion for the immediate enforcement of the remaining provisions of the SRSA should be granted.
Id. at 775.
9. After the Court of Appeals' April 5, 1989 decision, Towers filed, on May 12, 1989, its renewed motion to enforce the SRSA. The Court, anticipating granting the motion, asked the parties[1] jointly to formulate an acceptable order granting the motion to enforce. No agreement was reached, and no such order was ever agreed upon and presented to the Court.

CONCLUSIONS OF LAW
Throughout the long history of the SRSA, all concerned have been guilty of too much discussion and too little action. After the remand of the case following the Court of Appeals' April 5, 1989 order, it now appears, viewed in hindsight, that this Court was somewhat naive to expect the parties to benefit from extensions for briefing Towers' renewed motion to enforce the SRSA and to hope that they might weary of their pettiness and nit-picking. Such was not to be! The effect is well demonstrated by Towers' request that this Court enforce a settlement agreement allegedly reached on July 31, 1989: this is, in effect, a motion to enforce an agreement as to how to enforce a previous agreement (the SRSA).
The first issue to be determined by this Court concerning the enforcement of the SRSA is the Effective Date thereof. The Court interprets the provisions of the SRSA most pertinent to the question (set forth in ¶ 2 of the findings of fact above) as indicating simply that the SRSA would become effective when approved by this Court by the issuance of an appropriate order. The Court has earlier iterated this same interpretation, in its order and memorandum dated March 15, 1984 (see ¶ 4 of the findings of fact above), in which it first conditionally approved the SRSA. The Court also finds such an interpretation to *999 have been echoed, implicitly or explicitly, by the Eighth Circuit on two occasions (see ¶¶ 5 and 8 of the findings of fact above). Indirectly, two other provisions of the SRSA support this interpretation. Paragraphs 1 and 3 both provide that the SRSA will be void if not approved by the Court by a certain date. Although not conclusive, this supports the idea that the effectiveness of the SRSA is triggered by Court approval alone.
The Receiver has argued that the use of the plural "orders" in the SRSA's effective date provisions indicates that a single order approving the agreement is not sufficient to make the SRSA effective, but that additional "appropriate orders" must also be issued. The Court agrees with Towers that consideration of the context"approved by the ... Court ... by issuance of appropriate orders in this lawsuit and ... Cause Number 76-20C(1)" shows that "orders" was made plural only to reflect that two actions were involved, and that the issuance of orders was merely the means by which the Court's approval was to be expressed and not a separate condition in addition to the Court's approval.
The syntax of the text also supports this view. If the Court's approval and the issuance of further orders were two separate conditions, the syntax as to the two should be parallel and conjunctive, as in "shall not be effective until the Court approves the agreement and issues appropriate orders" or "shall not be effective until it is approved by the Court and appropriate orders are issued." Instead, the text reads "until approved by the ... Court ... by issuance of appropriate orders," which structure is neither parallel nor conjunctive, and suggests not two requirements, but only one. The Receiver's position to the contrary is further weakened by the fact that the Receiver fails to suggest with any specificity what issues remain to be addressed by any orders to be issued in addition to an order of approval.
The Receiver also insinuates that the Effective Date cannot have occurred because the Lease Modification and Mutual Release required by ¶¶ 5 and 13 of the SRSA and the dismissals required by ¶ 3 have not yet occurred. Receiver's Brief filed 10/26/90, p. 15. Paragraph 3 provides that:
Forthwith after the Effective Date, the parties shall file dismissals of their respective claims in this cause, with prejudice.... Also forthwith after the Effective Date, Towers shall dismiss, with prejudice, any and all suits against the Receiver....
Clearly, this language does not state a precondition of the Effective Date, but instead obligates the parties to a certain course of action after the Effective Date. The fact that the parties have not complied with this provision in no way affects the occurrence of the Effective Date itself.
Similarly, ¶ 5 provides:
The Lease shall be clarified, modified and amended by executing, forthwith after the Effective Date, the instrument entitled "Lease Modification" attached hereto as Exhibit "2", and by reference incorporated herein and made a part of this Settlement Agreement in its entirety.
This language, too, concerns a step to be taken by the parties after the Effective Date, and does not state a sine qua non of the Effective Date. Paragraph 13 reads:
Concurrently with the execution of this Agreement, each party shall deliver to his or its counsel ten (10) copies of the Mutual Release attached hereto as Exhibit "3". Each copy of said Mutual Release shall be executed by all persons included under said Mutual Release with the party delivering the same. Each counsel is hereby directed to hold all copies of said Mutual Release until the Effective Date and to deliver eight (8) of said copies to the other counsel at the time the dismissals of this cause are filed. Said Mutual Release shall not be effective until the Effective Date.
Like the others, this provision requires certain conduct by the parties, the timing and effect of which is dependent upon the Effective Date. It does not, however, add any conditions to the occurrence of the Effective Date.
*1000 Perhaps, rather than arguing that these three provisions establish further prerequisites to the Effective Date, the Receiver is instead arguing that the fact that the parties have not taken the steps required by these provisions is an indication that they did not actually believe the Effective Date to have occurred, and the Effective Date has not therefore occurred. The parties' beliefs are not relevant to a determination of the occurrence of the Effective Date. The Effective Date is not a malleable creature of the parties' imaginations or will, but rather an event certain, defined by the parties' agreement and triggered by circumstances (i.e., approval by an order of this Court) beyond the parties' control.
The Court finds that the SRSA's Effective Date occurred on December 2, 1985, when this Court issued its order approving the SRSA unconditionally, per the Court of Appeals' December 17, 1984 opinion and the parties' November 1, 1985 joint application for approval, which included their "Reaffirmation and Extension" of the SRSA.[2] The Court's initial attempt at approving the SRSA, on March 15, 1984, was invalidated by the Court of Appeals' decision dated December 17, 1984, and therefore cannot be said to trigger the SRSA's effectiveness. This conclusion as to the Effective Date is lent further support by the several opinions of the Court of Appeals adverted to above (see ¶¶ 5 and 8 of the findings of fact), particularly the direct pronouncement that the SRSA "has been approved and is binding" upon the parties. Towers v. Rimmel, 871 F.2d at 770. The Court next undertakes a step-by-step analysis of the SRSA to determine what must now be done to comply with it, given its December 2, 1985 Effective Date. The Court omits discussion of any provisions that are mooted by the passage of time or by subsequent events, that are not the subject of any current dispute or that otherwise require, in the Court's opinion, no current analysis or action.
Paragraph 5 requires the execution "forthwith after the Effective Date" of the Lease Modification that was appended to the SRSA as Exhibit 2. The Court thus orders the parties to execute the Lease Modification and file with the Court an executed copy within five days. As execution of the Lease Modification was to have taken place "forthwith" upon the Effective Date of the SRSA, the Court interprets the Lease Modification to have also become effective December 2, 1985. Paragraphs 6, 7 and 8 of the Lease Modification concerning parking will be considered to have been controlling since December 2, 1985.
Paragraph 6 provides that the rent payments due the Receiver immediately following the Effective Date were to be offset by an amount equal to 60% of the total paid by Towers to the Receiver between January 1, 1979 and the Effective Date as a portion of the gross revenues derived from the rental of meeting and banquet rooms. The parties have stipulated that the amount of the credit to which Towers is entitled under this provision is $152,003.79. See Second Stipulation of Facts, ¶ 5. That amount is taken into consideration in the Court's calculation as to a final judgment for damages in Cause No. 90-915C(1).
Paragraph 7 requires that Towers spend, between January 1, 1982 and June 1, 1986 at least $1,800,000 for "improvements, alterations, renovations or restorations to the Premises" including "furniture, fixtures, equipment and kitchen equipment" for the meeting and banquet facility that is the subject of ¶ 2. If, pursuant to ¶ 2(D), Towers elected not to construct the banquet facility, ¶ 7 nonetheless requires Towers' expenditure of $1,800,000 or more on improvements. The Court of Appeals has already determined that Towers' obligations under ¶ 7 have been met:
It is undisputed that Towers has in fact expended more than $3.5 million on improvements and alterations to the South Tower since the execution of the SRSA, in satisfaction of the $1.8 million expenditure *1001 requirement under paragraph 7 of the SRSA, which is in addition to its expense for installing the sprinkler system.
Towers v. Rimmel, 871 F.2d at 772. No further implementation is required as to ¶ 7.
Paragraph 9 provides that Towers is entitled to a credit in the amount of $8,468.54, representing 50% of Towers' payments for additional parking made under protest. The parties have stipulated that this credit was never given, and that the Receiver is thus indebted to Towers in this amount under the SRSA. The amount of this credit is taken into consideration in the Court's calculation as to a final judgment for damages in Cause No. 90-915C(1).
The subject of ¶ 13 is the Mutual Release which was to have been executed by the parties prior to the Effective Date and, in effect, held in reserve until then, to become effective upon the Effective Date of the SRSA. The Mutual Release having become effective December 2, 1985, the parties are ordered to file an executed copy with the Court within five days. By executing the release, each party releases the other from all claims "in existence as of the date of this Mutual General Release," i.e., in existence as of December 2, 1985; the release does not, therefore, affect the Court's determination of the issues raised in Cause No. 90-915C(1).

II. Issues Raised in Cause No. 90-915C(1)

In Cause No. 90-915C(1), the Receiver's complaint seeks from Towers the following amounts:

Monthly Rent payable 7/1/89 $ 66,666.67
Gross Rent payable 7/15/89 103,193.73
Gross Rent payable 8/15/89 98,333.33
Utility Expenses 114,884.30
 ____________
Total $383,078.03

Towers has stipulated to its owing the Receiver the first, second and fourth of these debts. See Second Stipulation of Facts, ¶¶ 1 & 2 and Stipulation filed 8/27/90, Exhibit A. As to the third, involving what the Court will simply call the "Gross Rent," the parties dispute both the amount and to whom it is owed. In addition to the Receiver's complaint, this Gross Rent is also the subject of Count II of Towers' counterclaims against the Receiver, Count I of Towers' third-party complaint against Hallmark, and Hallmark's counterclaim against Towers.
Concerning the Gross Rent, the parties have stipulated as follows:
Gross Rent, as defined in the Lease Agreement, was payable by Towers ... on August 15, 19[89], in the amount of $188,940.50 less the "appropriate Minimum Rent." The parties reserve the question as to whether the Receiver or Hallmark ... is the proper recipient of that payment. The parties further reserve the question of whether the "appropriate Minimum Rent" to be deducted from the Gross Rent is $66,666.67 (the July 1, 1989 Minimum Rent), or $133,333.34 (the Minimum Rent for July 1, 1989 and August 1, 1989).
Second Stipulation of Facts, ¶ 3. The parties further stipulate that Towers failed to make any payment of the Gross Rent due August 15 to either the Receiver or Hallmark.
As amended by the Lease Modification, § 2.2 of the Lease provides, in pertinent part, that:
On the 15th day of each month, Tenant shall remit the Gross Rent due, if any, which shall be computed as the amount by which the Gross Rent from the beginning of the Lease Year through the preceding month exceeds the sum of the Minimum Rent and Gross Rent previously paid for that Lease Year.
A "Lease Year" is defined in § 1.2(e) of the Lease as "the period from July 1 to June 30 in each year during the term hereof." If the formula for Gross Rent due is thought of in mathematical terms as Rent Due = X - (Y + Z), only Y, the Minimum Rent term, is in dispute. The parties have stipulated that X, the "Gross Rent from the beginning of the Lease Year through the preceding month," equals $188,940.50 and Z, "the Gross Rent previously paid for that Lease Year," equals zero.
*1002 The Court is thus called upon to determine whether, in calculating the Gross Rent payable August 15, "Minimum Rent ... previously paid for that Lease Year" (the Y term in the formula) means only the Minimum Rent paid on July 1 or the sum of the Minimum Rent paid on July 1 and August 1. The Receiver claims that Towers, in calculating Gross Rent payable on the 15th of each month, did not ordinarily subtract the Minimum Rent due on the first day of the same month. Towers, too, "acknowledges that ordinarily $66,666.67 [only one month's Minimum Rent] was deducted from the Gross Rent." Towers' Reply Brief, p. 9 [parenthetical added]. This practice shows the parties' consistent interpretation of the convoluted language of § 2.2 to mean that the Y term in the formula is the Minimum Rent paid through the preceding month. This interpretation renders parallel the terms "previously paid" and "through the preceding month" as they are used in close proximity in § 2.2. The Court therefore concludes that the Y term is $66,666.67, and that the Gross Rent payable on August 15 was $188,940.50 minus $66,666.67, or $122,273.83.[3]
The Court next turns to the dispute as to who is entitled to the Gross Rent that was payable August 15, 1989. The dispute arises from the fact that the closing on the Receiver's sale of the South Tower to Hallmark took place July 31, 1989. The Receiver takes the position, in essence, that he is entitled to the Gross Rent payable August 15, because this rent, based as it is on revenues earned through July, accrued during the Receiver's ownership of the property. Both Towers and Hallmark take the position that Hallmark's ownership of the property as of August 15 entitles it to the rent.
A recent Eighth Circuit opinion concerning similar circumstances is Fortune Southfield Company v. The Kroger Co., 931 F.2d 1282 (8th Cir.1991). There Kroger sold to Schnucks Markets, Inc. a grocery store under construction, and a dispute arose as to which of the two was responsible for certain construction costs under a provision in the Purchase Agreement which read: "Schnucks shall assume all of the obligations of Kroger ... accruing on and after the Closing Date." There, as here, the parties' arguments depended heavily on their differing views of the meaning of "accrued." The Court of Appeals in Fortune Southfield agreed with the district court that "the word `accrued' was sufficiently ambiguous to allow the introduction of extrinsic evidence" to determine its meaning, and expressed the opinion that:
Certainly there are contexts in which "accrued" means "due and payable." This is one of the dictionary definitions of the word. In the context of a sale like the present one, however, we think the parties could well have intended the word to refer to work done before the closing date, work done before Schnucks acquired any interest in the building. A buyer and seller allocating construction costs between themselves might very well ascribe such a meaning to "accrued."
Id. at 1284. The Court of Appeals affirmed the district court's finding that in that context costs for work performed before the closing date remained the responsibility of the seller.
All parties in the instant case cite Allen v. Pullam, 223 Mo.App. 1053, 10 S.W.2d 64, 66 (1928), for the proposition that "rent ... belongs to the owner at the time it accrues." The parties dispute the import of this rule, and the debate centers on the word "accrues." Just as in Fortune Southfield, this Court deems "accrues" to be an ambiguous term subject to appropriate interpretation in its factual context. *1003 Unlike the circumstances of Fortune Southfield, however, this Court has no actual contract language to construe. The Court makes no pretense of determining the parties' intention as to the August Gross Rent, because it is clear there was no agreement, or even discussion, on this point between the parties to the sale. The Court must instead determine how the law requires allocation of the Gross Rent due August 15, 1989, given that the calculation of that rent is based on revenues earned through July.
As Towers has put it, "The parties appear to agree that the Receiver can be entitled to the August Rent only if it `accrued' in July of 1989." Towers' Reply Brief, p. 7. The Court concludes that in this particular factual context the Gross Rent did accrue in July and so is owed to the Receiver rather than to Hallmark. The calculation of the Gross Rent due August 15 is based on revenues from room, beverage and food services through July, before the closing of the sale of the Receiver's interest to Hallmark. The fixing of the due date for such rent fifteen days later is no doubt a function of the time needed to gather the necessary sales data and perform the Gross Rent calculation. In this respect, Gross Rent differs significantly from simple monthly rent in a fixed amount, as to which the Court might be more likely to find "accrued" meaning "due and payable." Gross Rent is more closely akin to the construction costs in Fortune Southfield, in that the amounts of both Gross Rent and construction costs are dependent on changeable figures of revenue and labor/materials, respectively, which are earned or incurred as of a particular date. Just as the contract provision in Fortune Southfield was interpreted to leave the seller with responsibility for work performed before the closing of the sale, here the Court concludes that the Receiver as seller is entitled to the benefit of revenues earned before the closing of the sale, in the form of the Gross Rent based thereon but payable on August 15.
The foregoing discussion establishes that the Receiver is entitled to judgment against Towers on all four claims in his complaint: for the July 1, 1989 Minimum rent ($66,666.67), the July 15, 1989 Gross Rent ($103,193.73), the August 15, 1989 Gross Rent ($122,273.83) and utility expenses ($114,884.30).[4] The Receiver is, therefore, also entitled to judgment against Towers on Count II of its counterclaims concerning the August 15, 1989 Gross Rent. Towers is entitled to judgment in its favor on Count I of its third-party complaint against Hallmark, which seeks a declaration that Hallmark is not entitled to payment of the August 15, 1989 Gross Rent, and on Hallmark's counterclaim against Towers for the August 15, 1989 Gross Rent.
The Court next considers Count I of Towers' counterclaims, in which Towers claims certain credits against the Receiver under the SRSA and the Lease Modification:[5]

SRSA ¶ 6/Lease Modification ¶ 2(b) $152,506.00
SRSA ¶ 9 8,468.55
Lease Modification ¶ 6 58,584.91
 ___________
Total $219,559.46.

These credits are also the subject of one of Towers' third-party claims against Hallmark. By stipulation the parties have resolved much concerning the claim as to the first two credits. It is agreed that pursuant to ¶ 6 of the SRSA, Towers is entitled to a credit in the amount of $152,003.79. See Second Stipulation of Facts, ¶ 5. The parties further agree that pursuant to ¶ 9 of the SRSA, Towers is entitled to a credit in the amount of $8,468.54. Id. at ¶ 6. Because the language of ¶¶ 6 and 9 indicated that both of these credits were to be applied against "the rent payments due immediately following the Effective Date," which the Court has determined was December 2, 1985, there is no question that Towers is entitled to these credits as against the Receiver and not as against Hallmark.
*1004 The third credit arises from Towers' entitlement under ¶ 6 of the Lease Modification to 50 additional daily motor vehicle exits from the garage. Paragraph 5 of the SRSA provides that the Lease Modification shall be executed "forthwith after the Effective Date," and the Court will accordingly construe ¶ 6 of the Lease Modification as giving rise to a credit against the Receiver dating back to the December 2, 1985 Effective Date. The parties have been unable to stipulate to the amount of this credit, although Towers would bind the Receiver to the figure claimed by Towers, in light of the Receiver's statement in his October 10, 1989 report to the Court that he did not dispute the calculation of the dollar amounts of any of the three credits claimed by Towers. Then as now, the Receiver disputed Towers' entitlement to the credits at all, based on his position as to the Effective Date of the SRSA.
The Court notes that in 1989, at the time of the Receiver's report, Towers claimed the three credits here at issue in the same amounts as quoted in Towers' instant Count I. Nonetheless, Towers has since stipulated to different amounts for both the first and second credits. In light of the subsequent history of this matter, the Court is not persuaded that the Receiver is bound by his previous failure to dispute the amount of the parking credit under ¶ 6 of the Lease Modification, and so is unwilling to award Towers a credit in an amount not properly substantiated by the record now before the Court. The Court agrees with the Receiver that the documentation provided by Towers to date does not contain figures from "primary sources" and does not adequately explain and justify Towers' calculation of the credit claimed.
Accordingly, the Court announces Towers' entitlement to the credit dating back to the December 2, 1985 Effective Date of the SRSA, but makes no firm conclusion as to the amount of the credit. The parties are to meet forthwith and make good faith attempts to arrive at a stipulation of the amount of the credit owed under ¶ 6 of the Lease Modification. In ten days, such a stipulation must be filed with the Court or Towers must file documentation of its claim with the parties' joint memorandum explaining each party's calculation and setting forth, as required by Local Rule 7(C), the parties' efforts to reach a stipulation.
As to Count I of its counterclaims, then, Towers is entitled to judgment against the Receiver on the claim under ¶ 6 of the SRSA in the amount of $152,003.79 and on the claim under ¶ 9 of the SRSA in the amount of $8,468.54. The Court has also determined that Towers is entitled to judgment against the Receiver on its claim under ¶ 6 of the Lease Modification, but final judgment as to damages cannot be entered at this time. These conclusions dictate judgment in favor of Hallmark on Count II of Towers' third-party claims, which seeks declaratory relief for Towers against Hallmark if the Court were to find that Towers' credits under these provisions did not apply as against the Receiver.
Count III of Towers' counterclaims against the Receiver is for lodging expenses allegedly owed to Towers for its housing of Central Tower tenants following the March 1989 electrical fire. The parties have stipulated that the Receiver owes Towers the amount claimed, $59,236.78, in lodging expenses. See Stipulation filed 8/27/90, Exhibit A. Judgment on that count is thus entered in favor of Towers and against the Receiver. The parties have likewise stipulated to the proper amount of the liability alleged in Count IV of Towers' counterclaims concerning the Riverside Conference Center Lease; it is agreed that the Receiver owes Towers $25,889.00 therefor, and judgment on that count is entered accordingly. As to Count V of Towers' counterclaims, the parties stipulate that the Receiver owes Towers $52,747.87 for steam expenses and $31,982.81 for electrical expenses. Judgment on that count is therefore entered in favor of Towers and against the Receiver.
Count VI of Towers' counterclaims seeks enforcement of a settlement of all "financial issues" allegedly reached July 31, 1989, including the execution of the Mutual Release and the Lease Modification. In view of the fact that the Court has *1005 determined the Effective Date of the SRSA to be December 2, 1985, has ordered the immediate execution of the Mutual Release and Lease Modification, and here resolves the financial disputes raised before the Court, Count VI is effectively mooted. The Court has earlier expressed its unwillingness to enforce an agreement to enforce an agreement, supra pp. 998-99, and its overall approach in the resolution of this matter is to enforce, albeit belatedly, the parties' original settlement agreement, the SRSA itself. Judgment is therefore entered against Towers on Count VI of its counterclaims.
Count VII of Towers' counterclaims alleges the Receiver's breach of the Lease Agreement's provisions concerning Towers' rental of additional parking space for the July 4th weekend in 1988. Towers' request of 100 additional daily parking spaces for three days during the July 4th weekend was denied, and Towers claims the denial breached § 13.5 of the Lease.[6] The Receiver's response is to suggest that Towers' reading of § 13.5 would grant Towers the right to demand the entire garage and oust other Mansion House residents and occupants of their spaces, a contention that Towers does not address. Towers, on the other hand, accuses the Receiver of refusing it additional spaces, claiming unavailability, but at the same time offering additional spaces to others.
The Court must answer the two pertinent questions: (1) does § 13.5 condition Towers' right to additional spaces on availability, and (2) if so, were the additional spaces Towers sought available when they were requested. In pertinent part, § 13.5 provides:[7]
In the event Tenant desires to use more parking spaces than those described in Section 13.4, it shall have the right to rent such additional spaces on a daily or monthly basis at the then prevailing lowest daily or monthly rate[,] as the case may be[,] charged to others[.]
The Receiver urges that § 13.5 must be read in conjunction with § 13.1, which provides in pertinent part as follows:[8]
Tenant shall have the right to use the Garage for its business operations as follows:
13.1 The use of the Garage shall be on a non-exclusive basis and in common with such other users as Landlord shall permit; provided, however, that Tenant may, by signs ... state to the general public that the ten (10) parking spaces indicated on Exhibit B ... are reserved exclusively for use by Tenant and its guests.
Certain elementary rules of contract construction, stated aptly by the Missouri Supreme Court many years ago, guide the Court in its resolution of this dispute:
A contract of doubtful meaning will be given a construction which will make it fair and reasonable between the parties and will not give one party an unfair advantage of another ... Consideration is given to the contract as a whole and the fundamental rule for construing its language is to ascertain and give effect to the intention of the parties.
Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 507 (1952). A more recent statement of one of these rules was made by the Missouri Court of Appeals:
[A]n interpretation of a contract or agreement which evolves unreasonable results, when a probable and reasonable construction can be adopted, will be rejected.
Jim Carlson Construction, Inc. v. Bailey, 769 S.W.2d 480, 482 (Mo.App.1989).
To construe § 13.5 in absolute terms, due to the fact that it lacks express conditions on its application, would be to read too much into the provision and interpret it so as to "evolve unreasonable results." *1006 This Court declines to adopt a construction that would require the Receiver to meet Towers' demands for additional parking without regard for pre-existing obligations the Receiver may have to third parties concerning parking space. Such a construction would be unfair to the Receiver and cannot possibly be the intent of § 13.5. A reasonable limitation can be read into § 13.5 to avoid such a result: the words "subject to availability" can be appended to the provision. The provision then establishes Towers' priority over other would-be renters as to unrented space, but, as seems especially reasonable in light of the fact that Towers pays no premium for such additional space, gives Towers no right to preempt those who have already reserved space.
In addition to the inherent plausibility of such a construction, it jibes with § 13.1, the text of which and the placement of which at the beginning of the article concerning parking suggest is a provision of general application. The rule requiring consideration of a contract as a whole is served by the harmonizing of these two provisions. Towers' rights to use of the garage under the lease are explicitly said to be "on a non-exclusive basis and in common with such other users as [the Receiver] shall permit." This provision is general in its formulation, even to the extent that it governs all but ten of the spaces specifically enumerated for Towers' use under § 13.4 of the Lease. The availability limitation read into § 13.5 simply acknowledges that the rights granted to Towers thereby do not operate to the exclusion of other users with whom the Receiver has previously contracted.
On the other hand, to read § 13.5 to allow the Receiver to deny Towers additional parking space when available is to read too little into the provision, which must have been intended to grant Towers some advantage it would not have had absent the provision. Nonetheless, the Receiver's justification for the refusal of the additional parking is that in refusing Towers the space, "the Receiver reasonably acted to take into account the needs of all Mansion House tenants in determining the availability of additional space for the holiday weekend that could be leased to Towers." The "need" of Mansion House tenants to which the Receiver adverts is the long-time policy of allowing tenants to purchase parking passes for guests wishing to visit tenants during the July 4th festivities on the riverfront. The fact that the Receiver used a flyer to remind tenants of this privilege, even after having received Towers' request for additional space, does not detract from the Receiver's authority within the lease to so set aside or offer these spaces. Viewing the record as a whole, the Court finds that Towers' complaints in Count VII concerning the availability of the 100 spaces it requested must fail. Judgment on this count is therefore entered in favor of the Receiver and against Towers.
The last claim requiring the Court's consideration is related to the previous one: Count VIII of Towers' counterclaims alleging that the Receiver's denial of the 100 parking spaces constituted tortious interference with Towers' business relationships, for which tort damages are appropriate. The elements of tortious interference with a business expectancy are well settled in Missouri:
(1) A contract or a valid business relationship or expectancy (not necessarily a contract);
(2) Defendant's knowledge of the contract or relationship;
(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;
(4) The absence of justification; and
(5) Damages resulting from defendant's conduct.
See Boyer v. Independence Manor Care Center, Inc., 721 S.W.2d 246, 248 (Mo.App. 1986) and cites therein.
*1007 The Court finds that Towers has failed to sustain its burden with respect to the intent element of tortious interference, as to which the Missouri Court of Appeals has said: "The proof, of course, must show an intent and primary purpose in the actor to interfere and to cause the result the interference augurs." Hester v. Barnett, 723 S.W.2d 544 (Mo.App.1987). This Court cannot infer, from the record now before it, that the Receiver's denial of additional parking, which the Court has found was not a breach of the parties' contract, was done with an intent to injure Towers' business expectancy. Considering the nature of the relationship between Towers and the Receiver, such an intent would be self-defeating.
The commentary to § 766 of the Restatement of Torts 2d, quoted at length by the court in Francisco v. Kansas City Star Co., 629 S.W.2d 524 (Mo.App.1981), defines "intent" broadly to include even "an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." Id. at 530. Towers' Count VIII does not allege with specificity the nature of the claimed interference, but only states generally that Towers' "expectancy with prospective customers and guests of the Holiday Inn-Riverfront" was injured by the Receiver's denial of additional parking. Towers' brief does little to flesh out its claims, alleging only that:
The Receiver's refusal to provide the parking interfered with Towers' ability to rent its banquet facilities and rooms that year. Bad experience of guests who could not park in the building would cause harm in the future.
Towers' Opening Brief, p. 28.
The Court is not persuaded that Towers has shown that the two species of interference it complains of were actually necessary consequences of the Receiver's conduct, much less that the Receiver knew them to be necessary consequences of his conduct. Towers' burden with respect to the intent element has not been met. The Court thus enters judgment in favor of the Receiver with respect to Count VIII of Towers' counterclaims.

III. Conclusion

As to Cause No. 80-1563C(1), the Court this day announces its conclusion that the SRSA became effective December 2, 1985, when this Court issued its order approving the agreement unconditionally. Uncertain of the necessity of such an order at this time, but in accordance with the directive of the Court of Appeals, the Court orders the Receiver to allow Towers to withdraw the escrowed $500,000.00. Pursuant to the SRSA, the Court orders the immediate execution of the Lease Modification and the Mutual Release. Upon the filing of copies of these executed documents as ordered by the Court, Cause No. 80-1563C(1) will be closed.
In Cause No. 90-915C(1), the Court enters a partial net judgment in favor of the Receiver, reflecting the following calculations of the damages amounts now ascertainable:

Towers owes the Receiver:
July 1, 1989 Minimum Rent $ 66,666.67
July 15, 1989 Gross Rent 103,193.73
August 15, 1989 Gross Rent 122,273.83
Utility Expenses 114,884.30
-----------------------------------------
 $407,018.53
The Receiver owes Towers:
SRSA ¶ 6/LM ¶ 2(b) $152,003.79
SRSA ¶ 9 8,468.54
Lodging Expenses 59,236.78
Riverside Conference Center 25,889.00
Steam Expenses 52,747.87
Electrical Expenses 31,982.81
------------------------------------------
 $330,328.79
Net Damages:
 $407.018.53
 -330,328.79
 --------------
Towers owes the Receiver $ 76,689.74

*1008 The entry of an additional judgment for damages will be entered, if appropriate, on the claim under Count I arising from ¶ 6 of the Lease Modifications, as indicated by the parties' response to the order entered herewith.
In view of its conclusion that the August 15, 1989 Gross Rent is payable to the Receiver, the Court enters judgment as appropriate on the various other claims relating to this rent. The Court enters judgment against Towers on its claims concerning enforcement of a settlement allegedly reached July 31, 1989 and breach of contract and tortious interference by the Receiver concerning additional parking for the 1989 July 4th weekend. Finally, the Court enters judgment in favor of Hallmark on Towers' claim concerning the application of credits under the SRSA as against Hallmark, in view of the Court's determinations with respect to the Effective Date of the SRSA.
Because the Receiver and Towers have each had partial success in their claims one against the other, and neither party can be said to be the prevailing party in this litigation, they shall bear their own costs and attorney's fees. Hallmark's counterclaim against Towers for the August, 1989 Gross Rent is a claim for damages for an alleged breach of the lease, and so falls within § 34.11 of the lease, pursuant to which Hallmark must bear those of Towers' attorney's fees and expenses incurred in the defense of that claim only. The Court enters an order to that effect. Otherwise, Towers and Hallmark shall bear their own costs and attorney's fees incurred in the litigation of the other claims between them.
The parties have made no stipulations concerning prejudgment interest. Calculation of prejudgment interest with respect to the net damage award as between Towers and the Receiver is complicated by the number of separate claims involved and the variety of dates upon which the claims arose. The Court desires the assistance of the parties in resolving the issue of prejudgment interest. Accordingly, the parties are ordered to make good faith efforts to reach a stipulation as to the amount of prejudgment interest owed and to whom, and within ten days, the parties must file either a stipulation or their joint memorandum setting forth and explaining each party's calculation of the proper amount and to whom it is owed.
This order and memorandum are intended to provide a comprehensive resolution of the remaining disputes in the Mansion House litigation. The Court anticipates that the final determination of the single claim on which damages remain to be ascertained, expected within the coming weeks, will be the end of active litigation concerning Mansion House before this Court.
NOTES
[1] In the context of the SRSA, the Court uses the term "parties" to mean the Receiver and Towers. Hallmark was not a party to the SRSA and was not party to the Mansion House litigation in this Court until it was made a third-party defendant in Cause No. 90-915C(1).
[2] This approval having been of the SRSA as amended by the parties' Reaffirmation and Extension, the SRSA is now in force with ¶¶ 1 and 3 as amended. The changes made via the Reaffirmation and Extension, as the name implies, merely extended the date upon which the SRSA would be voided if not yet approved by the Court.
[3] The Receiver contends that, as a factual matter, Towers did not pay either the July 1 or August 1, 1989 Minimum Rents, and so is not entitled to have the August 15 Gross Rent offset by either of those amounts. Towers has in fact stipulated to its owing the Receiver $66,666.67 for Minimum Rent due July 1, 1989, and the Court's calculation as to a final judgment for damages takes that debt into account; the amount is therefore as good as paid and is thus properly deducted from the Gross Rent calculation for August 15. As for the Minimum Rent due August 1, 1989, the Court has determined it is not a factor in the calculation of the Gross Rent.
[4] All the damages amounts set forth here and below are ultimately incorporated in the Court's final calculation of damages.
[5] Towers' claims are based on its contention, now established by the Court, that the SRSA became effective December 2, 1985.
[6] This section is modified by ¶ 7 of the Lease Modification, but the changes thereby made do not affect the dispute now before the Court.
[7] The Court here sets out § 13.5 as it appears in the Lease, without the changes wrought by ¶ 7 of the Lease Modification, which changes have no bearing on the instant dispute.
[8] The Court here sets forth § 13.1 as it appears in the Lease; that provision is not altered by the Lease Modification.